Nott, J.,
delivered the opinion of the court:
This case presents, with unusual clearness, the question whether the Government is judicially liable for any of the war measures resorted to in the late rebellion other than the liability created by the Abandoned or captured property Act.
It may be conceded that the Government is liable, upon express contracts, to persons residing within the insurrectionary districts. Where the officers or agents of the Government entered into an agreement with a person who, for the time at least, wore the garb of a public enemy, and the Government reaped a positive benefit from the contract, while the contractor made a positive sacrifice on the faith of it; where, in short, there has been gain on the one side and loss on the other, and the gain has been acquired and the loss suffered on the faith of the agreement, such a contract has always been upheld. If the officers of the Quartermaster Department during the war with Mexico had entered into contracts in due form, and pur *470 suant to'their legal authority, there is no reason for saying that those contracts would not be binding upon the Government. In other words, there is no reason for saying that the Government is debarred from acquiring supplies by contract from the inhabitants of an enemy’s country. A different doctrine would be mischievous, injurious to the Government, and abhorrent to the liberal spirit which pervades modern international law.
But the case before us presents no such question. It in effect goes upon a supposed liability of the Government under these conditions, viz: for the acts of its officers, done under color of its authority, within the insurrectionary district, where the party injured was loyal, and the circumstances were such as would give to a citizen in time of peace a right of action against the Government under the mandate of the Constitution, that private property shall not be taken for public use without just compensation.
Our conclusion is that no such liability exists, and that no such action can be maintained. The rebellion passed immediately from the confines of a riot or insurrection and assumed the magnitude of a civil war. It is not to be questioned at this day whether it was anything less than a war; and it has been again and again decided that the rules which are applied in ordinary warfare are to be applied to it. All persons on this side of the military lines, from the legal point of view, were the enemies of all persons on the other. Those within the Confederate lines who openly or secretly sympathized with the United States and regarded themselves as loyal citizens of the rightful Government, so far as their constitutional and civil rights were involved, were in no better plight than the disloyal, and must be regarded by courts as public enemies in all cases affecting rights of property save one. That exception is the right given by the Abandoned or captured property Act, which alone authorizes the judiciary to look behind the established legal presumption and view the reality of the individual citizen’s condition.
The rule is a harsh one; but such is the established doctrine declared by the Supreme Court in every conceivable case — in land-captures, in admiralty, in cases of commercial intercourse across the military lines, in cases within our military lines, in cases where an antecedent agency existed, in cases where the agency was established before. the Non-intercourse Act took *471 effect, and in' cases where the agency was for the innocent purpose of shielding loyal property from Confederate confiscation. With regard to the last class, this court endeavored to establish a more lenient rule, based on the theory that before the rebellion one State was not a foreign country to the citizens of another State; or, in other words, that the citizen of the United States who dwelt in New York and dealt with the residents of Savannah was not bound to anticipate the contingency of a war, like the citizen who voluntarily goes into a foreign country to establish a business or a domicile. The rule which international law applies to ordinary wars between different' nations is that when a man goes into a foreign country to reside, or when he acquires property there, or holds commercial intercourse with its inhabitants, he is bound to contemplate the possibility of a war between that country and his own, and must so conduct his affairs as always to be ready for the consequences. The rule which this court endeavored to apply to the rebellion was that a loyal citizen of the North, acting in good faith and with no purpose to aid the rebellion, might simply save his property in the South by directing its investment there, provided that he sent nothing into the insurgent district and that he brought nothing out. It was thought in this case of civil war u that the law did not compel the loyal citizen, merely because he stood on loyal territory, to watch the ruin of his property within the rebel lines with folded hands, but that it allowed him to protect his own; always, however, with the proviso that he left the resources of the rebellion precisely as he found them.” (Sto (Mart’s Case, 6 C. Cls. B., 347.) But the Supreme Court thought otherwise, and through a long line of decisions has applied the rule of international warfare with all its rigors.
What, then, is the liability of the Government to one who, when his property was taken, occupied the place of a public enemy ?
In the prosecution of a war no government can be regarded as trespassing upon the property or infringing the legal rights of the enemy’s adherents. It is inevitable that a war must be prosecuted rigorously, and it is desirable that it be prosecuted as little to the injury of a government’s own citizens as possible. In the prosecution of a war the discretion of a government, so far as the enemy is concerned, takes the place of *472 ordinary constitutional restrictions or statutory provisions. Ail of those measures which were resorted to during the rebellion for the purposes of war must be regarded by the judicial authority as measures founded upon the necessities of the public safety.
In tbis case the claimant avers that he was in fact a loyal citizen of the United States, who never gave aid or comfort to. tbe rebellion; and, apart from his voluntarily leaving his domicile to remain within the Confederate lines, this averment may be taken as true in fact. But in law he cannot be clothed with this twofold character; he cannot be regarded as a loyal citizen of the United States and as a public enemy. The criminal portion of his case we put entirely out of view, and regard him simply in his self-assumed character of a public enemy. The facts upon which his case must now be adjudged are strictly these: that he was domiciled within the insurrectionary district when the war began and that he voluntarily entered and remained within the enemy’s lines until it ended. The liability of the Government in such a case, even to one of its own citizens, has been singularly adjudicated in this court before the prejudices and feelings which the rebellion may be supposed to have created had arisen. We turn back to an early decision of this court, which impartially, so far as the present case is concerned, disposes of that question.
In Pailletfs Case, the claimant was a citizen of the United States, who had resided in Mexico prior to and during the war. He maintained his allegiance to the United States, and for refusing to pay a contribution levied by the Mexicans to carry on the war was banished from, his residence in Tobasco. The naval forces of the United States captured Tobasco, and occupied the claimant’s house by order of Oommodore Perry, the commanding officer. The claimant .brought his suit for the occupancy and for certain depredations. The court, through Mr. Justice Scarburgh, he being a citizen of Virginia, decided as follows:
“ Under such circumstances, it does not seem to us that the-petitioner can, upon any principle, have any just claim against the United States. Though he was a citizen of the United States, yet he was domiciled in Mexico, and, notwithstanding war had been raging for many months between his own country and Mexico, he still remained in Mexico, and. continued the- *473 prosecution of bis trade and business there. He had been domiciled in that country for nearly twenty years. He had settled there and engaged in the trade of the country, and given such evidence, animi manendi, of an intention to remain as stamped him with the national character of the State in which he resided. He was not, strictly speaking, an enemy of the United States, yet he w7as such ip reference to the property connected with his trade and his residence. It was found adhering to the enemy, and he himself was adhering to the enemy, though not criminally so. He had taken no steps to throw off the national character which he had acquired by his residence in Mexico, and was therefore bound by all the consequences of it. He not 'Only had not returned to his native country or turned his back on Mexico on his way to another country, or commenced his removal bona fide without an intention of returning, but he had not even contemplated such a removal in any event. On the contrary, he continued to retain his domicile, and his property there belonged to him in his character of subject or citizen of Mexico, and consequently was subject to the laws of war and of reprisals, as if he had been actually an enemy.” (Wheat. Int. Law, book 4, chap. 1, § 16, p. 394 •, § 17, pp. 401-405; § 18, p. 407.)
It has been argued witb force that the liability of the Government in this case arose from the fact that the seizure was made by an officer of the Treasury. If it had been made by the Army or the Navy, it is conceded that the court would not have jurisdiction, and that no liability would have arisen. But this question depends upon the one which has previously been discussed. If the claimant was at the time a public enemy, it is not a matter for him to inquire by what agent of this Government was the injury inflicted or the property taken. •In the prosecution of a war it is immaterial whether it be carried on by those who are under the control of an executive department or under the control of a military commander. They are in both cases agents of the same belligerent power, and they are both operating to the same hostile end. What they do are simply the acts of their government; and its liabilities to those against whom it wars cannot be created or measured by the kind of agents which it employs.
The action of the Government here was a war measure. The seizure of the claimant’s property was not the taking of *474 private property for public use, but was to all .intents and purposes a military measure, directed to the end of carrying on the war for suppressing the rebellion. The object of the statute under which this agent of the Treasury Department acted was twofold; partly to prevent the means of absent owners, engaged in hostilities against the United States, from finding their way to them across the military lines, and partly to save the proceeds of such abandoned property for those who might be found ultimately to have been loyal adherents of the Government. The right of action given to them was not a right ordinarily accruing to an enemy against a government, nor a right founded upon the constitutional obligations of this Government, but strictly an act of grace, created and regulated by the statute. If this claimant was entitled to the benefit of that exceptional law, it was for him to have pursued his remedy according to its terms. Failing in that, he has no other legal right to assert, and consequently no other j udicial remedy to invoke..
Our conclusion is that, the Government is not liable upon implied contract to any person, loyal or disloyal, for property taken by its agents, civil or military, during the rebellion, within the insurrectionary districts, and that the only redress given to any person for property captured or seized is that provided by the Abandoned or captured property Act and the acts amendatory thereof.
The judgment of the court is that the petition be dismissed.