**ETLIMAR SOCIETE ANONYME OF CASABLANCA v. UNITED STATES.***

No. 48920.

United States Court of Claims.

July 15, 1952.

Sidney L. Struble, New York City, Hays, St. John, Abramson & Schulman, New York City, on the briefs, for plaintiff.

F. X. Daly, Long Island City, N. Y., Holmes Baldridge, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

On November 12, 1948, plaintiff, a corporation organized and existing under and by virtue of the laws of Morocco, having its principal place of business at Casablanca, filed its petition in this court to recover the sum of $34,736, with interest thereon, representing the value of 6,688[1] bales of cork.

* Motion for new trial pending.

1. In paragraphs 4 and 5 of plaintiff's petition the number of bales is indicated as 6,668. .Obviously this is a typographical error covered by Rule 55 of the Rules of this court, 28 U.S.C.A., entitled "Harmless Error," which provides in pertinent part: "The Court and Com-

Plaintiff alleges that this cork, which was located in the City of Fedala, Morocco, was, on or about November 17, 1942, "received and accepted from claimant" by the armed forces of the United States for its own account and use. Further, that the claimant thereafter duly filed with the War Department its claim for payment of the aforementioned merchandise and that no part of said payment has been made and "no other action upon the claim has been had by Congress or by any of the departments of the Government of the United States."

In the course of the hearing before the Commissioner of this court, it developed that plaintiff had filed, some time prior to April 4, 1947, its claim seeking to recover the value of the 6,688 bales of cork, with the French Commission Regionale d'Evaluation des Requisitions (hereinafter referred to as the French Commission), which was set up at Casablanca, French Morocco, pursuant to the Byrnes-Blum Agreement of May 26, 1946 (hereinafter discussed), to process and determine claims asserted against the United States Government. After this matter came to the attention of our Commissioner, as well as counsel for the defendant, all of the available facts with reference to this claim were obtained and made a part of the record. Upon the basis of this record we have adopted the Commissioner's findings of fact, among which is the finding that on April 4, 1947 plaintiff and the French Commissioner executed an agreed statement of facts regarding plaintiff's claim and that soon thereafter the French Commission made a preliminary payment of 1,090,000 francs on account, which plaintiff accepted. Some time later, on January 20, 1950, the French Commission determined that plaintiff was entitled to 1,699,818 francs, deducted the preliminary payment of 1,090,000 francs, and awarded the plaintiff the balance of 609,818 francs. The award specified 1,204,190 francs for 6,688 bales of cork, 463.15 metric tons, at 2,600 francs per ton, the balance of the 1,699,818 francs being for interest and two minor items. Plaintiff was given 15 days within which to advise the Commission whether it accepted or rejected the decision, and on January 21, 1950, the plaintiff accepted the award in writing without protest or reservation.

Later, on May 5, 1950, the French Commission notified the plaintiff in writing that the French Minister of Finance would allow payment of only 1,130,974 francs for 6,280 bales of cork weighing 434.99 metric tons, at the rate of 2,600 francs per ton, and hence the Commission offered to the plaintiff the difference between 1,130,974 francs and the amount of the preliminary payment, or 40,974 francs. In response to a request by the Commission that plaintiff advise if it accepted the decision of the Finance Minister plaintiff, on June 22, 1950, notified the said Commission in writing that it refused to accept the decision of the Minister of Finance, that the sum already paid on account was considered by it as a partial payment on what was due, and that it reserved all rights to the balance.

On July 26, 1948, plaintiff transmitted a letter to the President of the French Commission in which it stated that it was hopeful of obtaining the settlement of its claim and direct payment by the American authorities.

It appears from the evidence that the plaintiff did not otherwise advise the Commission concerning its efforts to recover directly from the defendant; there was no agreement by plaintiff to return to the French Government the preliminary payment of 1,090,000 francs or any future payments, should it succeed in recovering from the United States. Plaintiff has not returned any of the payment on account, and the claim is still open before the French Commission on the question of the balance due plaintiff.

From the above recital it appears that while the petition was filed in this court on November 15, 1948, plaintiff accepted on January 21, 1950, in writing, without protest or reservation, the original preliminary

missioners at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

award made by the French Commission of 1,090,000 francs.

Plaintiff bases its theory of recovery before this court upon two main contentions: (1) that the taking of the cork by the United States Army at Fedala, Morocco, in November of 1942 did not constitute a "requisition" or "taking" within the ordinary meaning of those terms, but that the defendant received and accepted the cork for its own use and subsequent resale to commercial interests and that the transaction therefore constituted a "sale" to the United States Government, and (2) that if the Byrnes-Blum Agreement applies to citizens and corporations of Morocco as a French overseas territory, then this transaction is not covered by the Agreement, since the said Agreement covered only "requisitions" of the property of such person.

In considering these propositions, we will briefly examine the facts leading up to the acquisition of the cork involved by the defendant.

In the fall of 1942, as part of the invasion of North Africa by the armed forces of the United States the town of Fedala was occupied by the 36th Engineer Regiment which landed there on November 8, 1942. Lieutenant Colonel George W. Gardes was then Executive Officer of the Regiment and several days later was made its Commanding Officer.

The area in and around Fedala and Casablanca was an active-combat zone from the date of the landing until January 1943, with blackouts at night, frequent air-raid alerts, sniping, air raids and resistance by Vichy France. As soon as the landing was made, the 36th Engineer Regiment took possession of the Port of Fedala and excluded all civilians from the area, including the civilian manager of the port. This port was operated by the Army as a subport of Casablanca, and Colonel Gardes was assigned the operation of said Port.

Fedala is a small port town on the coast of North Africa, located 12 to 15 miles north of Casablanca, and its port has one dock with berthing facilities for one ship at a time.

The cork involved in this suit had been standing on the dock for several months be-

cause of the lack of shipping space in ships bound for America. On November 23, 1942, Colonel Gardes received orders from his commanding officer at Casablanca to take the cork on the Fedala dock and load it on American ships as space became available. In executing this command he stationed soldiers at the dock to tally the bales of cork as they were loaded. Since the cork had been standing exposed to weather for several months it was very brittle, and when the bales were handled, segments or sections broke off. The cork was tied together with baling wire and was in such condition that some of the bales practically disintegrated when handled. Of the plaintiff's 6,688 bales, 6,280 were actually loaded on three ships that came into the port. In order that the Army would have space for the storage of supplies being unloaded, the remaining cork was pushed aside into a pile by means of a bulldozer and left on the dock. There is no evidence that the 408 remaining bales were ever taken by the Army or loaded on ships at Fedala.

The 6,280 bales of cork were shipped to New York as follows: 2,760 bales, weighing 441,600 pounds, on the S. S. Santa Maria, operated by the Grace Line, Inc., consignee not designated; 283 bales, weighing 45,280 pounds, on the S. S. Algic, operated by American Export Lines, Inc., consigned to the War Department; 3,237 bales, weighing 517,920 pounds, on the S. S. American Robin, operated by American Export Lines, Inc., consigned to the U. S. Commercial Company.

After the cork had been loaded at Fedala, the civilian manager of the port asked Colonel Gardes for a receipt for the 6,688 bales of cork. Colonel Gardes gave the manager a written statement, acknowledging that he had taken 6,280 bales and at that time the Colonel did not know who was the owner of the cork and had not even heard of plaintiff.

On January 8, 1943, the manager wrote to Colonel Gardes stating that the cork was owned by the plaintiff and that the entire stock of the cork stored at the dock had been taken and enclosed receipt forms covering 6,688 bales. Colonel Gardes refused

to sign and by letter replied that the tally kept by his checkers disclosed that 6,280 bales were loaded on the ships, whereas the receipt covered 6,688 bales, a difference of 408 bales, and concluded that the difference was undoubtedly due to the number of bales which fell apart when they were handled due to the dried-out condition of the cork and "if you desire a receipt for 6,280 bales of cork the same will be forwarded to you."

On December 8, 1942, the Office of the Commanding General of the Western Task Force wrote the plaintiff and acknowledged that certain quantities of cork taken at the Port of Fedala had been utilized by the Government of the United States in its operations in French Morocco and that representatives of the Government of the United States would meet with plaintiff to determine the price to be paid for the cork. Further, that it would be impossible to conclude the negotiations until such time as the members of the United States War Economics Board arrive in Casablanca, at which time plaintiff would be notified.

On January 13, 1943, plaintiff sent its bill to the Headquarters, Western Task Force, seeking payment for 6,688 bales of male cork, first choice, weighing 463,150 kilos, at $75 per metric ton, totaling $34,736.25 or 2,605,218.75 francs. On December 17, 1943, plaintiff filed with the United States War Department its claim for payment of 2,605,-218.75 Moroccan francs for 6,688 bales of cork. The Army has always recognized its responsibility to the plaintiff for 6,280 bales of cork which were actually tallied at the time the cork was loaded at the Port of Fedala. However, since plaintiff insisted upon seeking payment for 6,688 bales, the Army instituted an exhaustive investigation in an effort to account for the missing 408 bales. The investigation covered French Morocco as well as the United States where a detailed search was made through the records of various agencies handling shipments from Morocco. The search continued even after Colonel Gardes and his regiment had left Fedala in January 1943, but at no time did the investigation account for the missing 408 bales. The

plaintiff finally waived its claim for the 408 missing bales on the first day of the trial of this case before the Commissioner on January 16, 1951.

Obviously the main question before us is whether or not the Byrnes-Blum Agreement, under which the French Commission Regionale d'Evaluation des Requisitions was established, covered claims of the nature of the one now before us. On May 28, 1946, the defendant, acting through James F. Byrnes, Secretary of State, and the Provisional Government of the French Republic, acting through Leon Blum, entered into an agreement "Regarding Settlement for Lend-Lease, Reciprocal Aid, Surplus War Property, and Claims." [2] Paragraph 6(c) thereof provided as follows:

"As part of the general settlement, the French Government has agreed to process and pay all unpaid claims of French residents against the United States Government arising out of the use or infringement in war production of patent rights held by them, out of the requisitioning by the United States Government for use in the war program of any property interest owned by French residents, and out of acts or omissions prior to July 1, 1946, in France or French overseas territories of members of the United States Armed Forces or civilian personnel attached to such Forces."

Following the execution of this Agreement, otherwise known as and referred to through this opinion as the Byrnes-Blum Agreement, the French Government set up claims commissions in all places under French control where the United States forces had been stationed, including French Morocco, and collected for processing all claims against the United States arising out of requisitions by the United States Armed Forces. Under the Byrnes-Blum Agreement, the Government of France and the Government of the United States have treated the French Protectorate of Morocco as a French overseas territory and the residents of French Morocco, including Moroccan corporations, as French resi-

2. Treaties and Other International Acts, Series 1928, U. S. Dept. of State Publication 3557.

dents. In acting under the terms of the Agreement, the French Government accepted, processed, and paid claims of Moroccan residents and corporations against the United States growing out of the requisitioning by the U. S. Armed Forces of the property of such residents.

The Department of State of the United States officially interprets paragraph 6(c) of the Byrnes-Blum Agreement (Finding 18) as follows:

"This Department interprets the expression 'French residents' in this paragraph as referring to residents of French overseas territories as well as residents of France. This interpretation has been consistently followed by the Government of the United States and by the Government of the Republic of France in the administration of the Memorandum of Understanding. The French version of the memorandum, which is equally authentic with the English version, refers in literal translation, to the persons involved in this paragraph as 'persons resident in France or in French overseas territories'. (See Treaties and Other International Acts, Series 1928, page 54.) The only method of interpreting the English expression 'French residents' which would be consistent with the French version is by including residents of French overseas territories.

"The French zone of Morocco is deemed to be included in the expression 'French overseas territories' within the meaning of the Memorandum of Understanding of May 28, 1946. A Corporation organized under the laws of the French zone of Morocco is considered by this Department, therefore, as falling within the scope of the expression 'French residents' in Paragraph 6(c) of the Memorandum of Understanding."

Some time prior to April 4, 1947, the French Commission was set up in Casablanca, French Morocco, to process and determine, pursuant to the terms of the Byrnes-Blum Agreement, claims asserted against the United States. Also, some time prior to April 4, 1947, plaintiff filed its claim with this Commission seeking to recover the value of 6,688 bales of cork taken by the United States Army and shipped to the United States.

In our findings of fact we have described the treatment accorded plaintiff's claim by the various departments of the Government of the United States from May 30, 1945, to October 27, 1948, when the Department of the Army, after seeking the advices of the Department of State and the General Accounting Office, advised plaintiff that its claim was properly for submission to the French Government.

The Byrnes-Blum Agreement between the United States and France is the type of agreement which has been recognized as a treaty within the meaning of Article VI, Clause 2, of the Constitution and thus is a part of "the supreme Law of the Land". United States v. Pink, 315 U.S. 203, 228–230, 62 S.Ct. 552, 86 L.Ed. 796; United States v. Belmont, 301 U.S. 324, 330–331, 57 S.Ct. 758, 81 L.Ed. 1134; B. Altman & Co. v. United States, 224 U.S. 583, 600, 32 S.Ct. 593, 56 L.Ed. 894. In the Belmont case the Supreme Court said, 301 U.S. at page 330, 57 S.Ct. at page 760:

"* * * Governmental power over external affairs is not distributed, but is vested exclusively in the national government. And in respect of what was done here, the Executive had authority to speak as the sole organ of that government. The assignment and the agreements in connection therewith did not, as in the case of treaties, as that term is used in the treaty making clause of the Constitution (article 2, § 2), require the advice and consent of the Senate.

"A treaty signifies 'a compact made between two or more independent nations, with a view to the public welfare.' * * * But an international compact, as this was, is not always a treaty which requires the participation of the Senate. * * *"

This court has recently had occasion to consider the effect of treaties and international agreements upon the consent of the United States to be sued in the case of

Hannevig v. United States, 84 F.Supp. 743, 114 Ct.Cl. 410. At page 745 of 84 F.Supp., at pages 414 and 415 of 114 Ct.Cl. we said:

"The consent given by the United States to be sued is not a vested right and such consent may be modified or withdrawn at any time. * * *

"Plaintiff admits that the sovereign may modify or withdraw its consent to be sued but says that the Convention ratified April 30, 1948, does not supplant or override existing law; that it is a mere contract and should not be construed as divesting this court of jurisdiction of plaintiff's claim because the convention or treaty was not self-executing and does not, therefore, have the force and effect of an act of Congress. We think the rule upon which plaintiff relies is not applicable here. * * * The treaty making power embraces the rights and privileges of foreign nationals, and settlement of claims such as the one here involved has long been recognized as a proper subject of treaties and international agreements."

The plaintiff has argued in its brief that even if the cork had been requisitioned by the Army in Morocco, nevertheless the requisition would not be within the terms of the Byrnes-Blum Agreement for the reason that under that Agreement the property of a French resident must be requisitioned in the United States. The language contained in paragraph 6(c) of the Agreement clearly does not contain any such limitation as it specifically refers to property "owned by French residents * * * in France or French overseas territories * * *." Furthermore, the official interpretation by the French Government and the United States Department of State is that the expression "French residents" includes resi-- dents of French overseas territories and that Morocco is included in the expression "French overseas territories" and, further, that a corporation organized under the laws of the French Zone of Morocco falls within the scope of the expression "French residents." In the official interpretation of paragraph 6(c) by the Department of State above quoted, the Department specifically

points out that the French version of the Memorandum of Understanding of the Byrnes-Blum Agreement equally authentic with the English version, refers in literal translation, to the persons involved in this paragraph as "persons resident in France or in French overseas territories." Furthermore, it is established by the evidence that in acting under the terms of the Agreement, the French Government accepted, processed, and paid claims of Moroccan residents and corporations against the United States growing out of the requisitions by the United States armed forces of the property of such residents.

Under these circumstances we must reject plaintiff's contention that the property requisitioned by the United States Government was limited only to property requisitioned within the United States. We conclude, therefore, that the plaintiff was a French resident within the terms of the Agreement and consider now whether or not the plaintiff's property was "requisitioned" by the United States Army.

Plaintiff argues that while the acquisition of the cork by the United States Army did not constitute a requisition, nevertheless the transaction did give rise to an implied contract on the part of the United States Government to pay plaintiff its reasonable value.

There are two types of requisitions recognized and employed by the Army: (1) formal or regular requisitions and (2) informal or irregular requisitions. Property is acquired by the Army by irregular requisitions in times of emergency, in combat areas, and by armies in the field when circumstances do not permit time-consuming formalities. The Army recognizes and pays for property acquired by irregular requisition. This court recognizes irregular requisitions made in times of emergency and such requisitions of private property by the Army are analagous to the taking of private property by eminent domain. There is no question but that such an irregular requisition gives rise to an implied contract which calls for the payment of the fair market value of the property at the time and place of its taking. Salomon

v. United States, 19 Wall. 17, 22 L.Ed. 46; Walker v. United States, 34 Ct.Cl. 345.

Plaintiff says that since the defendant seized the cork and shipped it to the United States as shipping space became available and disposed of most of it through commercial channels, the concept of requisitioning for its own use for war purposes was thereby destroyed. What happened to the cork after it was originally seized by the United States is of no .concern to the plaintiff.

As this court stated in Walker v. United States, supra, 34 Ct.Cl. at pages 346, 347:

"In ordinary cases coming under the general jurisdiction of the court where private property is taken for public use, an action on the implied contract can be maintained. In cases of implied contract, it was established by the decision in the Supreme Court in Salomon's Case (19 Wall., p. 17 [22 L.Ed. 46]) that where private property was delivered to an officer for public use a contract will be implied though the property was not used, and the Government received no benefit from it. As a general principle, it may be said that where private property is taken for public use under conditions which will authorize a court to hold it a case of implied contract, the title passes to the Government, *eo instanti*, and it is no concern of the owner as to what use or purpose the Government puts it or whether the property perishes in its hands."

At the time this property was taken the defendant was engaged in a major offensive in the African Campaign of World War II. The Port of Fedala with its berthing facilities for only one ship at a time and the available dock space was greatly needed for the loading and unloading of wartime supplies and troops. Unquestionably, 6,688 bales of cork took up a great deal of the space on the Fedala dock and since it had lain there for months disintegrating in the elements we cannot conceive, and the testimony does not indicate otherwise, that the cork had any value whatsoever to the United States as such. The Army authorities were interested in obtaining the facilities of the dock at the Port of Fedala for wartime use and as long as plaintiff's cork remained on the dock the much needed facilities were not available to them. Thus the Army took the cork, moved it away, and acknowledged at that time its obligation to pay plaintiff the reasonable value of the number of bales so taken. The Army recognized the transaction as an irregular requisition, and this court recognizes it as such along with the obligation of the defendant to pay.

The Rules of Land Warfare contained in War Department Basic Field Manual, FM 27–10, pp. 84–85, (1940), deal with requisitioning by the Army. Paragraph 336 provides in pertinent part:

"Practically everything may be requisitioned under this article (Art. LII of the regulations above quoted) that is necessary for the maintenance of the Army and not of direct military use, * * *."

Paragraph 339 of these Rules sets forth the established policy of the Army in attempting to make prompt settlement for goods so taken, wherein it provides in part:

"All authorities agree that it is good policy to pay cash if possible and to *take up receipts as soon as possible.*"

Colonel Gardes admitted the liability of the Army for 6,280 bales of cork and had plaintiff accepted this count instead of persisting as it did until January 1951, the date of this trial, for payment of 6,688 bales, we have no doubt that it would have long since been paid.

■■ We find that plaintiff's property was duly requisitioned by the Army of the United States and that the transaction gave rise to an implied contract on the part of the defendant to pay the reasonable value of the property so taken. We further find that the French Commission possessed complete authority to settle all claims of this nature which remained unsettled on April 4, 1947. The Commission made its award to plaintiff which was later modified by the French Minister of Finance to cover the value of 6,280 bales of cork, the number of bales which plaintiff has con-

ceded before this court to be the number of bales for which it seeks payment.

Having reached this conclusion we are bound to accept the finding of the French Commission as to the reasonable value of the cork.

Plaintiff submitted his claim to the French Commission and therefore elected to pursue that remedy. Accordingly, we will dismiss plaintiff's petition and enter judgment in favor of defendant.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER, and LITTLETON, Judges, concur.