**Maria Jeritza SEERY**

v.

**The UNITED STATES.**

No. 340–52.

United States Court of Claims.

Jan. 11, 1955.

---

Gustave I. Jahr, New York City, Frederic A. Johnson, New York City, on the brief, for plaintiff.

Kendall M. Barnes, Washington, D. C., Warren E. Burger, Asst. Atty. Gen., Arthur E. Fay, Washington, D. C., on the brief, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

The Government moves to dismiss the plaintiff's petition on the ground that this court has no jurisdiction to adjudicate this case for three reasons which will be discussed in the course of this opinion. For the purposes of the motion, we adopt the plaintiff's recital of the facts.

The plaintiff is a citizen of the United States, naturalized in 1944, and has resided in the United States since 1935. She owns certain real property and the houses thereon in Austria, at Unterach am Attersee, which she acquired during or before 1929. She was also the owner of personal property, acquired before 1934, and which was, during the times here relevant, situated in the houses mentioned above. The personal property consisted principally of furniture, china and glassware, silver, rugs, paintings and objects of art, all of fine quality and great value.

Because of the elegance of the plaintiff's houses and grounds, which were situated on a lake surrounded by mountains and forest, and the magnificence of their furniture and appointments, the property was taken in July 1945 by the United States Army for an officers' club for social and recreational purposes. The main house had 24 rooms, a large garage, a boathouse and a bathhouse. There was also an 8-room guest house.

When the plaintiff, in the summer of 1948, visited her property she found that the real property had been greatly damaged, and practically all of the personal property had disappeared. She filed a claim with the Department of the Army, but has not been paid anything on her claim. She asserts that her property was taken by the United States for a public use, and that she is entitled to just compensation for the taking.

The Government contends that because the property was not in the United States when it was taken, the Constitutional guaranty of just compensation, contained in the Fifth Amendment is inapplicable. We have recently held to the contrary. Turney v. United States, 115 F.Supp. 457, 126 Ct.Cl. 202, 215. We recognized that there were no precedents upon the question, but it seemed to us that, since the Constitutional provision could be applied, without inconvenience, to such a situation, it ought to be so applied. In the Turney case, supra, the plaintiff was an alien corporation, whereas the instant plaintiff is an American citizen. If that fact is material, it is to her advantage.

The Government contends that the plaintiff's property, probably meaning her real property, was "enemy property" within the meaning of those words in international law, and was therefore subject to temporary appropriation by our armed forces. It cites Chief Justice Marshall's opinion in The Thirty Hogsheads of Sugar v. Boyle, 9 Cranch 191, 3 L.Ed. 701, to the effect that a sugar plantation in a Danish island seized by England in the War of 1812 was enemy property, and that the sugar produced therefrom was likewise enemy property, subject to seizure as a prize, when found on board a British ship. It cites Young v. United States, 97 U.S. 39, 60, 24 L.Ed. 992, which concerned cotton located in Confederate territory, but belonging to a British citizen. It quotes this language from the opinion in that case:

"All property within enemy territory is in law enemy property, just as all persons in the same territory are enemies. A neutral, owning property within the enemy's lines, holds it as enemy property, subject to the laws of war; and, if it be hostile property, subject to capture."

The Government cites The Juragua Iron Co., Ltd. v. United States, 42 Ct. Cl. 99; Id., 212 U.S. 297, 306, 29 S.Ct. 385, 388, 53 L.Ed. 520, and quotes the following language from the Supreme Court's opinion:

"The plaintiff, although an American corporation, doing business in Cuba, was, during the war with Spain, to be deemed an enemy to the United States with respect of its property found and then used in that country, and such property could be regarded as enemy's property, liable to be seized and confiscated by the United States in the progress of the war then being prosecuted; indeed, subject, under the laws of war, to be destroyed whenever, in the conduct of military operations, its destruction was necessary for the safety of our troops or to weaken the power of the enemy."

It cites Green v. United States, 10 Ct.Cl. 466, a case of a landlord of a building in Nashville, Tennessee, who, before the capture of the city by Union Troops, voluntarily went into and remained in Confederate territory. The court approved the confiscation of rents due him.

In response to the Government's argument on this point, the plaintiff insists that Austria was not, in July 1945, and thereafter, which was after the surrender of the German Army, enemy territory. She refers us to the Moscow-Conference Agreement, the text of which

appears in a Department of State publication dated November 1, 1943, which is reproduced in Document No. 351 of the House of Representatives, 78th Congress, 1st Session. The Agreement said:

"The Governments of the United Kingdom, the Soviet Union and the United States of America are agreed that Austria, the first free country to fall a victim to Hitlerite aggression, shall be liberated from German domination.

"They regard the annexation imposed upon Austria by Germany on March 15, 1938, as null and void. They consider themselves as in no way bound by any changes effected in Austria since that date. * * *"

The plaintiff cites us to Office of Public Affairs, Department of State Publication 5012, European and British Commonwealth Series 43, Released May, 1953, which contains the following statements on the pages indicated:

(p. 2) The Moscow Pledge:

"In the Moscow Declaration of November 1, 1943, the Four Powers pledged themselves to regard, and so treat, Austria as a liberated, not an enemy, country. * * *

"When the United States entered the war, President Roosevelt, December 9, 1941, named the countries which had been invaded by the Axis Powers and which must be liberated. Austria was included. * * *"

Later, August 1945, the Potsdam Agreement provided that "reparations should not be exacted from Austria. * * *"

(p. 3) "It was pointed out to the Soviets that Austria had never been considered as an enemy state, that Austria had never declared war against any member of the United Nations, that no U. N. nation had ever declared war against Austria, and that the position of Austria, both during the war and later, had been explicitly defined in the Moscow Declaration as that of a liberated country."

(p. 5) "The avowed purpose of the occupation was, first, to divorce Austria completely from German control—to undo the Anschluss of 1938. It was, second, to root out Austrian nazism and to punish war criminals. Lastly, it was to aid in the restoration of a free Austria in the spirit of the Moscow Declaration."

The plaintiff cites Department of State Bulletin Vol. XV, No. 384, November 10, 1946, which says, at the pages indicated:

(p. 864) United States Policy on Status of Austria (released to the press October 28):

"The Department of State considers that the visit to the United States of Dr. Karl Gruber, Foreign Minister of the Austrian Federal Republic, represents an appropriate occasion to reaffirm United States policy with respect to the status of Austria.

"During the period following the first World War, the United States Government steadily encouraged the development of a free and independent Austrian state based on democratic principles, and viewed with strong disapproval all Nazi attempts to force Austria into the German Reich. The attitude of the United States toward the military occupation of Austria by Germany and its formal incorporation in the German Reich in 1938 was guided by this consideration and by the well established policy of the United States toward the acquisition of territory by force. While, as a practical matter, the United States was obliged in its effort to protect American interests to take certain administrative measures based upon the situation created by the Anschluss, this Government consistently avoided any step which might be considered to constitute *de jure* recognition of the annexation of Austria by Germany.

"In his radio address on May 27, 1941 President Roosevelt referred repeatedly to the seizure of Austria, and described the Austrians as the

first of a series of peoples enslaved by Hitler in his march of conquest.[1] Secretary Hull stated at a press conference on July 27, 1942, that 'this Government has never taken the position that Austria was legally absorbed into the German Reich.'[2] * * * "

(p. 865) "The United States has accordingly regarded Austria as a country liberated from forcible domination by Nazi Germany, and not as an ex-enemy state or a state at war with the United States during the second World War. The Department of State believes that this view has received diplomatic recognition through the Moscow Declaration on Austria.[3] * * * In accordance with the objectives set forth in the Moscow Declaration to see reestablished a free and independent Austria, an Austrian Government was formed after free elections were held on November 25, 1945.[4] This Austrian Government was recognized by the four powers represented on the Allied Council, as announced simultaneously on January 7, 1946 in Vienna and the capitals of these states.[5] In its meeting of April 25, 1946 the Allied Council, moreover, considered a statement of the United States Government's policy in Austria made by General Mark Clark, and expressed its general agreement with section I, "Status of Austria," in which the United States maintained that since Austria had been liberated from Nazi domination it should be treated as a liberated area. * * *

"In order to clarify the attitude of the United States Government in this matter, the United States recognizes Austria for all purposes, including legal and administrative, as a liberated country. * * * "

On the question, then, of whether the property in question was subject to confiscation as enemy property, or as property in enemy territory, it seems to us that the precedents cited do not support the Government's contention. Assuming, for the moment, that Austria was, at the time in question, enemy territory, the personal property taken was not a product of enemy soil, as in the case of The Thirty Hogsheads of Sugar v. Boyle, supra. Neither the land nor the personal property was *hostile property*, as was the cotton involved in Young v. United States, supra. The property did not endanger the safety of our troops, as in the Juragua Iron Works case, supra. The owner of the property did not live within the enemy lines, voluntarily, as in Green v. United States, supra, or at all.

Oppenheim on International Law, 6th Ed. 1940, Vol. II, says at Section 140 that Article 46 of the Hague Regulations, which says that "private property may not be confiscated" does not prevent the utilization of private buildings, temporarily, as hospitals, barracks and stables, without compensation. Wheaton on International Law, 7th Ed. 1944, page 248 says substantially the same. From the context it would seem that these departures from the Hague Regulations are permitted in order to enable a commander in the field to meet emergency situations relating to his troops and supplies. They would hardly seem to be applicable to the taking of a luxurious estate, at a remote location in a resort area, for use as an officers' club some months after hostilities had ended.

█ We do not find it necessary to decide whether taking without compensation would have been lawful if the circumstances had been otherwise the same as they were, except that the property was in enemy territory. We think that Austria was not, at the time in question, enemy territory. The German armed

---

1. Bulletin of May 31, 1941, p. 648.
2. Bulletin of Aug. 1, 1942, p. 660.
3. Bulletin of Nov. 6, 1943, p. 310. See also Bulletin of Nov. 20, 1943, p. 344.

4. Bulletin of Oct. 21, 1945, p. 612. See also Bulletin of Oct. 28, 1945, p. 665.
5. Bulletin of Jan. 20, 1946, p. 81.

forces had surrendered, unconditionally, some months before, and there were no enemy activities in Austria.

If we take at anywhere near face value the numerous expressions of the Executive Department, which is responsible for the conduct of our foreign relations, Austria was, after the surrender of Germany, a nation liberated from a German occupation which had never been recognized as lawful by our Government. The property in question, then, was no more subject to uncompensated confiscation than it would have been had it been located in Holland or France or the Philippines. The fact that the Allies chose to maintain occupation forces in Austria to prevent possible pro-Nazi uprisings, and perhaps to keep watch over each other, seems to us not to be material.

The Government defends further on the ground of an agreement made between Lieutenant General Geoffrey Keyes, the United States High Commissioner in Austria, and the Chancellor for the Federal Government of Austria, on June 21, 1947. That agreement provided that the United States would pay Austria 308,382,590 schillings [6] in full settlement for all obligations incurred by United States forces during the period 9 April 1945 to 30 June 1947. The agreement, by its terms covered claims of the kind here involved, and extended not only to claims of nationals of Austria, but to persons owning property in Austria. The Austrian Government agreed to settle or adjudicate such claims and to guarantee full protection to the United States against such claims. The agreement appears in a publication of the Department of State, Treaties and Other International Acts, Series No. 1920, 61 Stat. 4168.

We are now confronted with this problem. From what we have said in this opinion, it is evident that we think that the plaintiff's property was taken under such circumstances that she was entitled under the Fifth Amendment to the Constitution, to be paid just compensation. We must now decide whether the agreement took that right from her.

The Government cites United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796; United States v. Belmont, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134; B. Altman & Co. v. United States, 224 U.S. 583, 32 S.Ct. 593, 56 L.Ed. 894, to the effect that an executive agreement such as the one here present is, though not ratified by the Senate, a treaty within the meaning of Article VI, Clause 2, of the Constitution.

The plaintiff urges that even if that were so, it would be immaterial, because even a formally ratified treaty cannot accomplish what the Constitution forbids. She cites Doe ex dem. Clark v. Braden, 16 How. 635, 657, 14 L.Ed. 1090; The Cherokee Tobacco, 11 Wall. 616, 620–621, 20 L.Ed. 227; De Geofroy v. Riggs, 133 U.S. 258, 267, 10 S.Ct. 295, 33 L.Ed. 642. She points out that in the cases cited by the Government no constitutional rights of American citizens were impaired by the executive agreements with which those cases were concerned, and that in the Pink case, supra, Justice Douglas, 315 U.S. at page 227, 62 S.Ct. at page 564, and Justice Frankfurter, 315 U.S. at page 236, 62 S.Ct. at page 568, impliedly reserved the question as to whether the executive agreement would have been valid if it had impaired Constitutional rights of American citizens.

■ Whatever may be the true doctrine as to formally ratified treaties which conflict with the Constitution, we think that there can be no doubt that an executive agreement, not being a transaction which is even mentioned in the Constitution, cannot impair Constitutional rights. Statements made in our opinion in Etlimar Societe Anonyme of Casablanca v. United States, 106 F.Supp. 191, 123 Ct.Cl. 552, which point in the other direction, are hereby overruled. The decision in the Etlimar case, supra, was justified by the fact that

6. The schilling was worth at the time, about 5 cents.

the plaintiff there sought and obtained the compensation from France to which the executive agreement there involved relegated it. In Hannevig v. United States, 84 F.Supp. 743, 114 Ct.Cl. 410, this court held that a formally ratified treaty between the United States and Norway, which relegated a Norwegian citizen who had a claim against the United States for the taking of his contract to have ships constructed in an American shipyard, to diplomatic procedures for the settlement of his claim, amounted to the withdrawal by the United States of its consent to be sued by him.

It is probably still the law that Congress could effectively destroy a citizen's Constitutional right such as, for example, the right to just compensation upon a taking of his property by the Government, by a statute withdrawing the Government's consent to be sued. But Congress have given consent to be sued for such a taking and has conferred jurisdiction upon this court to adjudicate such a suit. It would be indeed incongruous if the Executive Department alone, without even the limited participation by Congress which is present when a treaty is ratified, could not only nullify the Act of Congress consenting to suit on Constitutional claims, but, by nullifying that Act of Congress, destroy the Constitutional right of a citizen. In United States v. Guy W. Capps, Inc., 4 Cir., 204 F.2d 655, the court held that an executive agreement which conflicted with an Act of Congress was invalid.

The Government's motion for summary judgment is denied. The plaintiff's cross-motion for summary judgment is also denied, since the facts which we have assumed for the purpose of discussing these motions have not been proved.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.