**Maria Jeritza SEERY**

v.

**UNITED STATES.**

No. 340-52.

United States Court of Claims.

May 7, 1958.

See also 127 F.Supp. 601, 130 Ct.Cl. 481.

Gustave I. Jahr, New York City, for plaintiff.

Kendall M. Barnes, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

MADDEN, Judge.

The plaintiff sues for just compensation for the taking by the Army of the

United States of her real and personal property.

The plaintiff was a resident of Austria until 1935, in which year she became a resident of the United States. She became a citizen of the United States in 1944. Beginning in 1921, she began to come to the United States each year to sing at the Metropolitan Opera in New York, where she was a star of the first magnitude. At some time before 1929 she acquired three properties at Unterach am Attersee in Austria. The property with which this case is directly concerned is a castle-like villa located on a lake and surrounded by mountains and forests. It is property No. 100. Property No. 99 is across the road from No. 100, and is a guest house accessory to No. 100. Property No. 125 is, like No. 100, a lake front villa some ten minutes walk from No. 100. A large addition to No. 100 was completed in 1930, as was the extensive remodeling of the old part of the house. The two villas were used only in the summer months, No. 100 and its guest house by the plaintiff, and No. 125 by her two sisters, Mrs. Wachtl and Mrs. Krones, residents of the Sudetenland in Czechoslovakia, and their families.

In 1935, upon removing her residence to the United States, the plaintiff gave up a large apartment which she had occupied for some years in Vienna. She caused the furnishings of the apartment to be packed for shipment and had some of them shipped to the United States. The greater part were, however, shipped to Unterach, to be placed in house No. 100. The plaintiff then went to Unterach and made an inventory of the contents of house No. 100, including, however, only those things which had already arrived there out of the Vienna apartment. Many of the things sent from Vienna had not yet arrived at Unterach.

. Among the boxed things that had arrived when the plaintiff was at Unterach was a trunk full of silver. It contained numerous sets of sterling table silver. The trunk was placed in house No. 100. The plaintiff had the trunk opened and the trunk and its contents moved across the road to house No. 99 and placed in the room of the plaintiff's caretaker, Mr. Speigner. The trunk was repacked and locked. Perhaps two other boxes or trunks of silver were placed in the same room.

After about two weeks at Unterach, the plaintiff caused house No. 100 to be locked up, gave the keys to the caretaker, returned to Vienna and a few days later started for the United States. From that time in 1935 the plaintiff never returned to Unterach, or to Austria, until 1948.

So far as appears, the caretaker faithfully cared for the property. The gardens, which had been beautifully planted, mostly with roses, when the plaintiff was using the property, may have been maintained during the earlier years. There is some evidence, by no means conclusive, that in 1941 a unit of the German Army occupied the property. If this occurred, the house and its contents were not visibly disturbed, since witnesses for the defendant testified that they saw things in apparent good order inside the house as late as 1943.

In 1944 the Nazi authorities took possession of house No. 100, first as a nurses' training school and shortly after that as a hospital for unmarried mothers. Prior to this occupancy, Mrs. Wachtl, the plaintiff's sister, caused the furniture from many rooms of No. 100 to be removed to No. 99 and stored in one or two rooms there.

In 1941, when the United States and Germany each sent home the consular officials of the other, Dr. Gyssling, the German consul at Los Angeles, who was a friend of the plaintiff, secured her permission for his daughter, Angelica, and his housekeeper to live in No. 99 at Unterach. The housekeeper, Mrs. Boone, was an American citizen of German birth. She and Gyssling's daughter went to Unterach. Later No. 99 was taken by the German authorities as a shelter for refugees, and Mrs. Boone and Angelica lived in No. 125, the Wachtl villa.

About June 1, 1945, the Wachtl family, who were refugees from the Czechs, suc-

ceeded in getting to Unterach. There was a quarrel between them and Mrs. Boone about the right to occupy No. 125, a number of Mrs. Boone's relatives and other persons who had fled from Vienna having taken residence there with her. The German authorities required Mrs. Boone to move out and the woman in charge of the hospital in No. 100 allowed her and her sister-in-law and Angelica to sleep on the floor in that house.

About the middle of June 1945, Captain Clayton, whose duty it was to locate sites for rest centers for enlisted men and officers of the 65th Division, United States Army, came to Unterach. He was referred by German officials to Mrs. Boone as a possible interpreter. When he went to find Mrs. Boone, he discovered house No. 100 as a desirable rest home for officers. He recommended it to his superiors and it was taken for that purpose. The hospital moved out a few days later. The house was renovated, necessary repairs were made by labor furnished by the Burgomeister, the furniture which had been stored in No. 99 was replaced in No. 100. Mrs. Boone was employed as housekeeper and supervisor; she hired the necessary servants; Captain Clayton and a sergeant resided in the house.

The Army remained in possession until June 30, 1947. Until the spring of 1947, the house was used as a rest center for officers up to and including the rank of captain. They came in groups of from 10 to 20 at a time, and stayed for about a week. Every other night there was entertainment by musicians and other entertainers obtained from the area. There were dances, and there was drinking to the extent that might have been expected. There was fishing, boating, swimming, horseshoe pitching, ping-pong and attempts at baseball. During the last few months of the American occupancy, the house was used primarily as a rest center for staff officers of the rank of colonel and above. Only about fifteen such officers used the rest home. One or two of them at a time, with their wives

and children and members of their staffs, would come for a week-end.

In January 1946, the American Military Government for Austria appointed an Austrian bank as the administrator of house No. 100 and its contents. On July 11, 1947, after the Army had ceased to use the property, it released it to the custody of the bank. As we have seen, the plaintiff returned to her property in August 1948, released the publicly appointed administrator and made her own arrangements for the future care of her property.

The plaintiff claims that large numbers of highly valuable items in the line of silver, chinaware, crystal, pictures, rugs, linens, tapestry and furniture were destroyed or stolen during the American occupancy of the house. That occupancy covered only two of the thirteen years that the plaintiff was out of touch with her property.

The plaintiff has fairly well persuaded us that most of the things for which she sues were on the property in 1935, and had disappeared by 1948. That, of course, is only a short step in the direction of persuading us that the things were still there in 1945 and had disappeared by 1947.

Most of the missing valuables were relatively small objects, dishes, silver, porcelain decorative pieces, pictures, rugs, etc. They could have been carried off very easily by anyone who had access to them. Probably many of them would, if they had been there, have been carried off by the perhaps thousand or more young officers who made use of the rest home. We think, however, that not many of these objects were in house No. 100 when the Army took possession of it.

When Captain Clayton set about to make the house ready for visitors, he sent for dishes from a nearby factory or army supply depot. He would not have done so if the closets had been stacked with sets of dishes such as the plaintiff claims to have lost. The same is true of the bed sheets, table linen, blankets, etc. Several inventories were

made of the contents of the house. They were made by different persons; they described room and objects by different designations; they are hard to reconcile with one another; but none of them come near to including all of the types of things, or the numbers of the things, which are claimed by the plaintiff. Some of the closets may have been locked, at some of the periods of time, but some of the china and glassware closets had glass doors, and their contents would have been visible.

The plaintiff urges that since the Army, upon taking possession of the property, did not make an official inventory, and give the plaintiff a receipt for the property taken, it is in no position to contest the plaintiff's claim that what was there in 1935 was there and was taken in 1945. The Army's failure to do, or to cause the German authorities to do, what international law wisely requires when property is taken, does make its position somewhat more vulnerable. But when, as in this case, there is evidence of the happening of events which disturbed the 1935 status of the property, and evidence, which we believe, of the fact that the most of the property in question was not present in 1945, and hence was not taken, there would be no justification for penalizing the Government for not making an inventory and giving a receipt, by making it pay for property which we think it did not get.

We have referred to the trunk of silver which the plaintiff, in 1935, placed in the room and the custody of her caretaker. In 1945, Captain Clayton, having obtained some army tableware which was not up to the standard of an officers' rest home, learned about the plaintiff's silver. With a good deal of formality and over protests of the plaintiff's caretaker and her sister, the needed pieces of silver were carefully counted out and receipted for. The receipt given indicates that three days later some additional pieces were taken and receipted for. There is no oral testimony as to the circumstances of this second taking. The plaintiff says that that left in the caretaker's room in house No. 99, nine-tenths of the contents

of the trunk that was opened, and two other unopened trunks or boxes of silver. All of that silver is alleged to have disappeared, except possibly a few casual items such as trays, and the plaintiff says that the Government should pay for all of it. But there is no evidence that the Army ever had it. Both the plaintiff's caretaker and her sister, though they died before the trial in this case, were alive when the plaintiff returned to her house in 1948 and investigated the disappearance of her belongings. The silver could not possibly have disappeared from the caretaker's room in house No. 99 which was never occupied by the Army, without their knowing what became of it. Yet no evidence is offered, even in the nature of hearsay, on the subject.

A large amount of the plaintiff's silver was used at the wedding supper when the plaintiff's niece was married at Unterach in 1946. The trial commissioner of this court made the following finding:

> " * * * Plaintiff has acknowledged that the silver used at the wedding was recovered in 1948, * * *."

The plaintiff took no exception to this finding. She asked only that the following finding be made:

> "This silver was given to Cinda Wachtl and her mother by an American Officer, and a receipt was given to the Officer."

Cinda Wachtl testified not only that it was given to her by an American officer at house No. 100, but that it was returned to the officer after the wedding, all in 1946. Yet the plaintiff recovered it in 1948, a year after the Americans had left the scene. If we were frankly told from whom and under what circumstances the wedding silver was retrieved, it might throw much light upon the problem of the disappearance of much of the plaintiff's property.

The plaintiff takes the position that the Army, having caused the trunk to be opened, and having taken and receipted for some of the silver, became responsible for all the silver, no matter

who stole it. That is of course not the law. The Army never took possession of any of the silver in the trunk or in the room except what it receipted for. The rest of it remained in the possession of the plaintiff, in her house and in the care of her designated custodian.

On the whole case, a study of the evidence gives no answer to the question of what became of the plaintiff's possessions. We have the impression that a relatively small fraction of them came into the possession of the Army. Even that small fraction, however, would have had a considerable value, since the plaintiff's things were luxurious and expensive. There were accurate inventories made at the beginning and the end of the second year of the Army's occupancy, and those inventories showed a considerable loss by breakage or disappearance of objects. The first year of occupancy would have involved much more use of the plaintiff's things, with proportionately more breakage and disappearance. The house no doubt had hard usage during the occupancy.

We think a considerable amount of the plaintiff's personal property was lost or destroyed while in the Army's possession, and that considerable damage was done to her house. Without any pretense of accuracy, and treating the question as a jury would have to treat it, we conclude that the plaintiff may recover eleven thousand dollars.

The Government raises anew the questions which we considered and decided when we denied its motion for a summary judgment. Seery v. United States, 127 F.Supp. 601, 130 Ct.Cl. 481. We adhere to the views expressed in that opinion.

The plaintiff is entitled to recover eleven thousand dollars, which amount includes any interest which might be payable as a part of just compensation, and judgment will be entered to that effect.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.