Davis, Judge,
delivered the opinion of the court:[1]
This is a suit by an inactive Cuban corporation[2] to recover for an alleged taking of its property in Germany by *384 the Department of the Army. Recovery is premised, basically, on two theories: (i) just compensation under the Fifth Amendment[3] and (ii) compensation under Article 331 of the Rules of Land Warfare.[4]
Following World War II the United States Army assembled at 14 storage areas in western Germany and France a large quantity of used military vehicles, which in 1948 were transferred to the German Government for a fraction of their acquisition cost. In turn, the German Government conveyed title to the vehicles to a quasi-public German corporation organized in 1946, Staatliche Erfassunge Gesell-schaft (STEG). Many of the trucks were sold in the period from 1948 through 1950, mostly for export to foreign destinations such as Indochina, Singapore, South America and Cuba. In February 1950 STEG entered into a “global contract” with one George Dawson whereby it sold all the remaining stocks of trucks, located at six storage areas. In the meantime, a private German corporation by the name of Trucks & Spares was organized, and in September 1950 STEG, Dawson and Trucks & Spares entered into a tripartite agreement which had the effect of transferring Dawson’s rights under the global agreement to Trucks & Spares.[5]
At the instance of the European Command of the United States Army (EUCOM), the United States High Commissioner for Germany (HICOG), in September 1950, requested the German Government[6] to direct STEG to “freeze” (i.e., suspend the sale of) surplus vehicles in its possession so as to supply EUCOM’s needs. The German Government *385 honored the request and, as a consequence, the Army screened and removed a large proportion of the automotive equipment in STEG’s possession.
This was the situation in December 1950 when Autos Car-retera Central S.A. of Cuba (Carretera) expressed an interest in buying from plaintiff a quantity of Dodge cargo trucks and Chevrolet telephone construction trucks. Plaintiff’s principal business was the purchase, sale and rental of automobiles, trucks and automotive equipment. Lewis Kane was at this time plaintiff’s purchasing agent. Kane knew of the surplus trucks available from STEG in Germany and went there in December 1950 to find the equipment wanted by Autos Carretera. At the instruction of Trucks & Spares, Kane inspected a large group of surplus trucks in storage at STEG’s depot at Kitzingen in Germany. There is evidence that during the month of December (on or about the 21st), Kane visited Kitzingen and made a list of some of the vehicles now involved, in addition to others with which we are not concerned.[7] Kane then returned immediately to Cuba. On January 2,1951, Carretera contracted in writing to purchase from plaintiff 60 Dodge trucks and 25 Chevrolet telephone construction trucks.
Kane came back to Germany on January 9, 1951, and on January 20, 1951 entered into a contract with Trucks & Spares on behalf of the plaintiff to purchase, inter alia, 82 Dodge iy2 ton 6x6 military type trucks and 25 Chevrolet iy2 ton trucks at $200 each. The contract called for payment by plaintiff as soon as an export permit was obtained. On March 7, 1951, such a permit was issued, authorizing shipment to Cuba of the trucks which were the subject of the contract. On March 12, 1951, plaintiff paid in full for the 82 Dodge trucks by separate checks of $1,640 to Trucks & Spares and $14,760 to STEG, and was given a receipt by Trucks & Spares. On the same day plaintiff paid Trucks & Spares $100 by check and was given a receipt showing its *386 acceptance as a down-payment on the 25 Chevrolet trucks (and 80 GMC trucks, not involved in this proceeding). Also on March 12,1951, Trucks & Spares gave Kane a receipt for $3,000 as a further deposit on 25 Chevrolet telephone construction trucks under the January 20 contract.
In the meantime the Army asked HICOG to ascertain whether there were any economically reparable trucks left in the remaining STEG stocks, and if so to “freeze” them for screening so that a selection might be made to meet the requirements of the Army. Consequently, on March 17, 1951, STEG imposed a second “freeze” on all of its remaining equipment — at the formal request of HICOG. The freeze was voluntary on the part of the German Government and no compulsion was exercised by HICOG, or so the parties agree. STEG froze its stock solely on orders from its German superiors, and not as an agent of the American authorities. STEG was, however, given a promise by HICOG that it would be reimbursed for, any claims which it might have to pay third parties who had already purchased but had not secured delivery of surplus trucks taken in the second freeze.
A team of Army representatives screened all of the surplus trucks in the various STEG depots. In the course of a survey of the vehicles at the Kitzingen depot ending April 5, 1951, the survey team picked out all vehicles of certain types which were wanted, regardless of their condition, with the intention of removing all such vehicles to rebuilding plants for disassembly and restoration and “cannibalizing” unusable vehicles for parts to install in others. After the vehicles had been selected by the survey team, plaintiff submitted its list of choices to the German sellers.[8] It was then informed that 81 of the 82 Dodge trucks and all 25 of the Chevrolet trucks at Kitzingen depot had been selected by the Army. On April 19 the German authorities released the freeze on all vehicles, at the various depots, which the Army had not marked. STEG was instructed on the latter date by *387 the German Ministry of Economics to hold the vehicles selected by the Army and to deliver them to the Army on request. The German authorities took the position at the time that for practical political reasons they could do nothing but obey the requests of the American authorities with respect to the trucks selected.
When Kane first learned of the second freeze in late March 1951 he wired protests to all agencies involved and announced his intention to remove the trucks which plaintiff claimed to own. The German authorities expressed their regrets to plaintiff on April 3, 1951, and stated that the freeze had been imposed at the “direction of the Allied High Commander.” When Kane appeared at the Kitzingen depot on April 3,1951, ostensibly to demand delivery of the trucks, he was told by STEG personnel in charge that he could not remove the trucks because of the freeze. On May 4 HICOG informed plaintiff that the 81 Dodge trucks were to be reacquired by the Army; on May 7 STEG notified plaintiff that the 25 Chevrolet trucks were to be reacquired; and on May 13 HICOG advised plaintiff that the 25 Chevrolet trucks and 81 of the 82 Dodge trucks were to be reacquired. On May 24, 1951, plaintiff submitted to EUCOM invoices for the seized vehicles totaling $238,090. On June 11, 1951, plaintiff augmented its invoices with certain documents purporting to evidence its ownership of the trucks and demanded payment for them.
Until August 2,1951 the trucks remained physically at the Kitzingen depot under the control of STEG personnel who were holding them until the Army called for them. From August 2, 1951 to January 1952 the Army removed the trucks, by installments, from the depot to rebuilding centers. For several years thereafter the plaintiff carried on protracted settlement negotiations with defendant’s officials and German authorities. These negotiations were still in progress when plaintiff filed its petition in this court on May 27, 1957, to recover for the 81 Dodges and 25 Chevrolets repossessed by the United States.
*388 I
Defendant objects that the running of the six-year statute of limitations prevents plaintiff from maintaining its cause.[9] If the case be viewed as a claim for a taking under the Just Compensation Clause, the success of this challenge depends upon the time the Army appropriated the trucks; that is when the cause of action, if any, would first have accrued. See, e.g., Stafford Ordnance Corp. v. United States, 123 Ct. Cl. 787, 793, 108 F. Supp. 378, 381 (1953). See, also, Soriano v. United States, 352 U.S. 270, 272 (1957). For such an appropriation, neither actual physical control or custody by the Government (see Anderson, Clayton & Co. v. United States, 129 a. Cl. 347, 122 F. Supp. 835 (1954)[10]) nor the absence of such factors (see, e.g., Societe Cotormiere Du Tonkin v. United States, 145 Ct. Cl. 426, 441, 171 F. Supp. 951, 959 (1959), cert. denied, 361 U.S. 965 (1960); Matthews v. United States, 87 Ct. Cl. 662, 714 (1938);[11] cf. Todd v. United States, 155 Ct. Cl. 87, 292 F. 2d 841 (1961)) is necessarily conclusive. The guiding questions which must be asked are: (a) Has the Government acquired effective control over the property which it seeks to utilize for a public purpose?[12] (b) If so, when was the extent of the taking, or *389 the kind and quantity of the property appropriated, determined or determinable? See, e.g., United States v. Dickinson, 331 U.S. 745, 749 (1947).
Assuming (but not deciding) that the defendant would be liable if suit were timely brought for taking the trucks, we start our analysis of the limitations problem, under these general principles, with the time of the so-called second freeze. At the request of the United States, the German Federal Ministry of Economics, on March 17, 1951, directed STEG to immediately exclude from sale or delivery the “U.S. goods”[13] at its depots. This freeze, the parties agree, was not itself a taking, but solely a means of conserving property until a selection could be made. Cf. Anderson, Clayton & Co., Inc., v. United States, supra. An Army survey team from Washington later came to screen the equipment and parts at the STEG stations. On March 28th and 29th and on April 4th and 5th, the Army team listed and marked trucks and automotive equipment located at Kitzingen. HICOG, on April 18th, sent the lists of selected items, which were the results of this survey, to the German Ministry of Economics which, in turn, instructed STEG to lift the hold-order except as to the listed items, and to keep .those for delivery to the United States. Thereafter, in the latter part of the month, the Army posted a representative at Kitzingen as a property accountable officer in charge of shipping the chosen trucks to rebuilding centers. The Army, however, did not actually begin the removal of the trucks from the depot until August 1951. If the presumed taking occurred when the trucks were selected and marked by the Army, in April 1951, or when the plaintiff was told of their reacquisition (by May 13th), then plaintiff’s suit (brought May 27, 1957) is barred; if, on the other hand, the taking took place only when the trucks were transported out of Kitzingen, during and after August 1951, the suit is timely.
We see no adequate reason to hold that the trucks were not appropriated until they were physically removed from *390 Kitzingen. Once the freeze order was issued by the German Government, STEG had no option but to act according to its terms; STEG could do nothing except to hold the trucks during the freeze and, after it was lifted, deliver to the United States Army, when it called for them, those trucks which had been selected. See finding 16(e). The Army had its own representative on the spot. As a matter of fact, therefore, the United States had effective control over the trucks either in March 1951 when the freeze was imposed or in April when the earmarking was accomplished and the exact kind and quantity of the reacquired trucks became known. Cf. Anderson, Clayton & Co., Inc., supra; Turney v. United States, 126 Ct. Cl. 202, 115 E. Supp. 457 (1953); Etlimar Societe Anonyme of Casablanca v. United States, 123 Ct. Cl. 552, 106 F. Supp. 191 (1952). If there was any doubt of the intention of the United States to take the particular trucks which plaintiff claimed as its own, that point was clarified, prior to May 27,1951, by letters to plaintiff from STEG and the United States authorities. On April 19th STEG wrote that the Dodge and Chevrolet trucks had fallen “under this block.” Finding 17(d). HICOG, on May 4th, informed plaintiff that the Dodge trucks were to be taken (finding 18(a)) and, on May 13th, advised that the Chevrolet trucks would also be taken (finding 18 (b )). Plaintiff did not question that the trucks it wanted had been appropriated by the Army; on May 24th it sent a telegram to EUCOM making a claim, in the form of an invoice, for 81 Dodge trucks and 25 Chevrolet trucks totaling $238,090.
There were no further steps which would have given the Army greater control over the trucks than it had in the middle of May 1951. By that time, the precise vehicles taken were known to the Army, to STEG and the German authorities, and to plaintiff. The Army could have had them anytime it desired. Despite this, the German Government, it is said, might possibly have cancelled the freeze and gone back on its agreement with HICOG. If that government had such authority, it could take the same step so long as the trucks remained in Germany, even though in the American Army’s possession. Physical possession would not give *391 the Army greater control than it bad on May 15th. We think, therefore, that the taking, if such it was, had occurred by that date and plaintiff could immediately have brought suit, claiming under the Constitution.[14] One of our holdings in the comparable case of Turney v. United States, supra, directly supports this conclusion. There, American surplus property, mistakenly including radar equipment, was sold for the benefit of the Philippine Government. The United States thereafter, induced the Philippines to embargo the exportation of the property so that the buyers would be pressured into agreeing to permit the Army to take charge of the equipment. The court held (126 Ct. Cl. at 214) that a taking occurred on October 13, 1947, when an American officer and a team of enlisted men segregated the radar equipment from other goods at a depot, notwithstanding findings showing that the equipment was not shipped out until November and December 1947. 126 Ct. Cl. at 231-32.[15]
Plaintiff, suing under Article 331 of the Eules of Land Warfare as well as the Fifth Amendment, has a second string to its bow. It urges that Article 331 delays the emergence of the right to compensation until “peace is declared.” The Article reads:
Private property susceptible of direct military use.— All appliances, whether on land, at sea, or in the air, *392 adapted for the transmission of news, or for the transport of persons or things, exclusive of cases governed by naval law, depots of arms, and, generally, all kinds of ammunition of war, may be seized, even if they belong to private individuals, out rrmst be restored and compensation peed when peaee is declared. * * * [Emphasis added.]
By virtue of this regulation, plaintiff insists that it had no cause of action until President Truman (Proclamation No. 2950, 66 Stat. c. 3) and a Joint Resolution of Congress (65 Stat. 451 (1951)) proclaimed a termination of the state of war with Germany in October 1951.
Let us assume for this case that Article 331 applies here, and that it affords the injured individual a personal, justiciable cause of action, vindicable in this court. We also assume, again without deciding, that before “peace is declared” not only enemy aliens but also neutrals and citizens would be barred from seeking compensation, under the Article, through a suit resting on the Tucker Act. On those postulates, when could an action be instituted? The formal declaration,'in October 1951, of the end of the state of war was not necessarily the only date upon which “peace is declared” within the meaning of Article 331. Laws or regulations using terms of this type must be read in the light of their special objectives and backgrounds; the end of the technical state of war is not automatically controlling. Cf. Lee v. Madigan, 358 U.S. 228, 230-31 (1959); Note, 47 Colum. L. Rev. 255, 268 (1947).
The regulations immediately following Article 331 (which refer to it) state:
332. What included in rule. — The foregoing rule includes everything susceptible of direct military use, such as * * * motors, bicycles, motorcycles, carts, wagon, carriages * * *.
333. Destruction of such property. — The destruction of the foregoing property and all damage to the same is justifiable if it is required by the exigencies of the war. [Emphasis added.]
Articles 331-333, when read together, as they should be, indicate to our mind that delay in payment under 331 was intended to subsist, at least for non-enemies, only during the period of actual warfare, that is, when, “the exigencies *393 of war” require it. The more recent Army Field Manual (27-10) (July 1956), in Paragraph 403, the successor to Article 331, replaces the words “when peace is declared” with “when peace is made.” That language is designed to mean the same as the earlier version because both regulations are derived from Article 53 of the Hague Convention of October 18, 1907, 36 Stat. 2277, 2308, which also uses the words “when peace is made.” In the same context, paragraph 409 of the 1956 manual provides:
If property is seized * * * a receipt therefor should be given the owner * * * in order that restoration and compensation may be made at the conclusion of the war. [Emphasis added.]
These latter phrases — “when peace is made” and “at the conclusion of the war” — suggest, in their setting, that the delay provision of Article 331 was inserted, not to await the formal declaration of peace, but to postpone the question of payment to the earliest practicable date after the close of the fighting, when the “exigencies of the war” would allow the seizing power to turn its consideration to the unwarlike subject of compensation. In World War II, the cessation of hostilities was officially proclaimed by the President as of December 31, 1946, Proclamation No. 2714, 61 Stat. 1048. This seems to us the most appropriate date for the accrual of any right to compensation under Article 331 (assuming there is such a justiciable right). The fighting was over and reconstruction had begun.[16] Part of that rebuilding would include restitution for property previously taken during the hostilities. Postponement of the right until the coming of formal peace would not, so far as we can tell, serve any significant function, but would go counter to the normal principle that the right to claim compensation for a taking should be deferred no longer than necessary.
It is true that, for Germans (or Germany), there might still be bars to suit in this court under the common-law rule *394 precluding their access to our courts, or perhaps through the vesting provisions of the Trading With the Enemy Act; others with property in Germany might also face these or similar disabilities. Cf. Farbenfabriken Bayer A.G. v. Sterling Drug, Inc., 251 F. 2d 300 (C.A. 3), cert. denied, 356 U.S. 957 (1958). But so far as Article 331 itself was concerned, any justiciable claim for a past seizure would accrue.[17] If, as plaintiff must necessarily argue, Article 331 continued to apply until the war was wholly terminated in October 1951, seizures under that Article between January 1947 and October 1951 would become immediately compensable (even though in some instances suit could not be brought at once because the owner was “under legal disability or beyond the seas,” see footnote 17).
This construction of the regulation seems to us most consonant with its terms and purpose, especially as applied to the circumstances of World War II. In plaintiff’s case, postponement of limitations works in its favor. If, however, we had been faced with a claimant whose property in Germany or Japan was seized under Article 331 in 1947,1948, or 1949 (as plaintiffs says it could be, plaintiff’s theory would demand that a suit in those years (or in 1950-1951) be condemned as premature, even though the owner was not otherwise disabled from litigating in this court. Such a strange rule would have had untoward consequences for the defeated countries and those dealing with them. After the cessation of hostilities, the United States endeavored more and more to foster normal trade relations with Germany (as well as Japan). Since the terms of Article 331 cover broad, general classes of property (see, also, Article 332), in adopting plaintiff’s position we would be obliged to say that the United States could induce trade with Germany and Japan after 1946, and once goods of the nationals of friendly states, or even of United States citizens, reached the shores of Germany *395 or Japan, tbis country could seize them and lawfully delay consideration of payment until formal peace. We need not accept that result as compelled by Article 331.
II
Were plaintiff able to overcome the hurdle of the time-bar it would still have to prove that it owned the trucks when they were purportedly taken by defendant.[18] The parties are agreed, and we concur, that German law governs the passage of title.
On January 20, 1951, plaintiff and Trucks & Spares executed the formal contract for the sale of the Dodge and Chevrolet trucks. The writing contained nothing explicit as to when title was to pass.[19] For such situations, section 929 of the German Civil Code provides:
For the transfer of ownership of a moveable it is necessary that the owner deliver the thing to the acquirer and agree with him that the ownership shall pass. If the acquirer is in possession of the thing the agreement as to the passing of ownership is sufficient.
Unless the buyer of a moveable has the property in his possession (plaintiff never did), physical delivery is ordinarily required in order for title to pass. The German sellers never attempted to deliver. In certain circumstances, however, section 930 of the Code adds a mollifying element:
Where the owner is in possession of the thing, an agreement between him and the acquirer relating to a legal relation whereby the acquirer acquires indirect possession takes the place of delivery.
Plaintiff’s position is that, if it can show that it identified the specific trucks it wished to take and that it communicated its choices to Trucks & Spares before the freeze in *396 March 1951, it would have acquired “indirect possession” and, hence, title. Taking the law to be as plaintiff suggests, the issue is narrowed to the factual question of whether plaintiff identified to the sellers — before the freeze — the particular trucks it wanted.[20]
As we have previously stated, Kane (acting for plaintiff) did make an inspection of the trucks at Kitzingen depot in December 1950; he was accompanied by a Mr. Kingelman whom he hired for that purpose.[21] Plaintiff insists that it was then that the trucks selected for purchase were marked and listed. The evidence does indicate that a handwritten list of some kind was made, because an official of STEG confirms that in December Kane proffered to him a list of trucks. The STEG official, however, refused to accept it and told plaintiff to give it to Trucks & Spares since the latter was the party with which plaintiff was negotiating. Plaintiff does not argue that this offer of a list to the STEG official was an effective communication of its choices. Kane testified, without giving details, that he then (in December 1950) gave the list to an official of Trucks & Spares, and it is this communication upon which plaintiff relies. To the Trial Commissioner, who found for plaintiff on this point, it seemed natural to suppose that Kane, having once attempted to deliver the list to STEG, would immediately transmit it to Trucks & Spares as it was suggested he do.[22] Nevertheless, both Trucks & Spares and STEG were unable to find such a list or a record or copy of it in their files.[23] Moreover, the written agreement between plaintiff and Trucks & Spares (executed in January 1951, one month after the alleged delivery of the list to Trucks & Spares) contained the clause that “the vehicles will be inspected and marked by the buyer.” (Emphasis added.) The formalized agreement *397 thus speaks of an identification to be made in the future. This raises serious doubts as to Kane’s testimony. If he had given the list to Trucks & Spares in December, would he not have become alarmed when the contract recited a selection to be made in the future? To avoid losing to another buyer the right to the vehicles selected in December (presumably those which were in the best condition) it would have been natural for Kane, if he had made a definite choice one month before, to incorporate the list into the written contract, or to make sure that the seller knew the exact trucks he had chosen. The record is devoid of any evidence that Kane protested the language of the contract or that he attempted to have the list of trucks appended to, or incorporated in, the writing.
On February 9th, Trucks & Spares sent the following letter to STEG:
With contract of January 20, 1951, we sold to the Cuban Truck & Equipment Company, Havana, Cuba, represented by Mr. KANE, the following vehicles from the Depot Kitzingen:
$ ‡ $
25 Chevrolets, 1% tons, 4x4,
82 trucks, 1% tons, 6x6, Dodge.
We ask you to give adequate instructions to the Depot Kitzingen so that the inspection and selection of the above-mentioned vehicles can be smoothly effected by Mr. KANE or his representatives.[24] [Emphasis added.]
*398 On February 19th, STEG wrote to the Kitzingen depot:
The firm of Trucks & Spares informs us that with contract of January 20, 1951, the following vehicles were sold from the Depot Kitzingen to the firm of Cuban Truck & Equipment Company, represented by Mr. KANE:
‡ ‡ *
25 Chevrolets, P/2 tons, 4x4,
82 trucks, iy2 tons, 6x6, Dodge.
We request you to send us a list in duplicate af ter the inspection and selection of the vehicles so that we can transmit a copy to the firm of Trucks & Spares. [Emphasis added.]
It is evident, if these letters are taken at face value, that both STEG and Trucks & Spares were relying on the personnel at Kitzingen to inform them of the trucks Kane selected, if and when he made a selection.
Nearly one month later, on March 12th, Trucks & Spares gave Mr. Kane a letter granting permission to make his selection at any of the depots:
Referring to your conversation you had today with our Mr. Hess we confirm to you that we are willing to change our contract insofar as we will give you permission to pick out your trucks from any of our stock, located in any STEG camp.
This letter is not conclusive by itself that no prior selection had been made, but if it is taken together with the formal contract, the absence of any record of a list, and the letters of February 9th and 19th a formidable case is made that Kane never handed the list to Trucks & Spares in December 1950 as he testified he did.
There are still other circumstances. After the March freeze Kane met Bingelman at Kitzingen and received from him the handwritten list which had been prepared in December; Kane, in turn, gave it to Kitzingen personnel to copy. Prior to that time, the depot did not have a copy of the list or know which trucks had been selected. If Kane had actually marked the vehicles in December, it seems unlikely that Kitzingen would not have known about it. It is significant, also, that Kane had to go to Bingelman to obtain the list; Kane himself apparently had no copy of the single handwritten paper he had drawn up in December. *399 The original was given to Kingelman, and Kane did not keep a copy. In those circumstances it is hard to believe that a copy (now lost) of the handwritten list was made for and given to Trucks & Spares in December.[25]
We cannot escape the conclusion that it was not until April 3rd that STEG, Trucks & Spares, or the Kitzingen complement was made aware of the selections Kane had made in December. We reconstruct the events in this way. When Kane and Kingelman inspected the trucks in that month, it was probably with the intention of making a final choice. The same intention persisted when Kane submitted the list to the STEG official. But once the list was returned to him by STEG, Kane, we infer, had some afterthoughts. There was no immediate need to turn the list over to Trucks & Spares because the contract had not yet been executed and the trucks selected could be sold to others during the interim. Besides, the inspection had been made hurriedly (in a day or a day-and-a-half) when the trucks were all covered with snow, causing difficulty in ascertaining which were the best vehicles. We judge that, with this in mind, Kane did not deliver the list to Trucks & Spares, but gave it to Kingelman so that the latter could continue with the inspection and determine what parts of the listed trucks were missing. Kane may very well have planned that, after Kingelman had made a closer inspection of the trucks (which Kingelman did in fact during the rest of December), the list would be reviewed and desired changes in selection could then be made without the possible red *400 tape which would accompany modifications if the list had already been handed to Trucks & Spares. Kane left the list with Ringelman and departed from Germany. When Kane returned to Germany in January to execute the contract, nothing in the record indicates that he saw Ringelman. Why Kane did not obtain the list from Ringelman and deliver it to the seller at that time, we cannot say for sure. Perhaps he simply forgot. More likely, however, he wondered whether a better selection could not be had at stations other than Kitzingen. On this basis, he probably wanted some more time to look around and then to obtain permission to select vehicles at the other depots. This view is supported by the letter of March 12th — just a few days prior to the freeze — giving such permission.
Whether or not we are correct in what we make of the evidence, we are convinced that, on this record, plaintiff has not carried its burden of proving that it did communicate its selection to Trucks & Spares prior to the freeze. The Trial Commissioner felt that “no reason can be surmised for a failure on his [Kane’s] part to communicate the same information [as he had offered to STEG] to Trucks & Spares and to the personnel at the Kitzinger depot” and that “it is not realistic to believe that Kane would have failed to comply with such simple requirements.” We have suggested reasons why Kane could very well have delayed making and communicating his final choice. In any event, we think that, on balance, the weight of the evidence does not fall on plaintiff’s side. We cannot find, therefore, that the selection was ever communicated to the German sellers or that title to the trucks passed (under séction 930 of the German Civil Code) to plaintiff prior to the March freeze.
For the foregoing reasons, we conclude that plaintiff is not entitled to recover. Its petition is dismissed.
BINDINGS 03? FACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follow:
1. The plaintiff corporation.
*401 (a) Plaintiff is a corporation organized in 1948 under the laws of Cuba. It ceased active business in 1951, when it transferred all of its assets except the present claim to a newly formed successor Cuban corporation under the name of Agencia Central de Motores y Accessories, S.A., owned and officered primarily by the individuals who owned plaintiff corporation. Subsequently, the second corporation’s assets were transferred to another Cuban corporation known as Agencia de Tractores y Equipos, S.A., also primarily owned and officered by the same individuals. These individuals are American citizens now residing in the United States and persona non grata in Cuba. Seven percent of the stock in the last-named corporation is owned by two Cuban nationals who are corporate officers, one of whom is at present a refugee living in the United States. The various companies referred to were engaged in the purchase, sale and rental of automobiles, trucks and automotive equipment in Cuba. The assets and records of plaintiff and its successor corporations were seized by the Cuban Government in October 1960 but the companies were not nationalized because of their inactive status.
(b) On April 2, 1962, the day preceding the concluding trial session in this case, the stockholders of plaintiff corporation held a general stockholders meeting in Miami, Florida, and adopted a resolution to dissolve the company. They designated Herman A. Kane as liquidating trustee with instructions to “liquidate the assets of the corporation, to determine and deliver to each stockholder the remains in cash or specie, their proportional participation as represented by the stocks held, as well as to issue the public deed for the dissolution of the company and its registration in the corresponding registers previous payment of any taxes, if there be any, and prior to cancel all stock outstanding and in circulation.” The minutes of the meeting reflected that at thait time the sole stockholders of the corporation were Herman A. Kane, Terry Kane, and Mrs. Anna Kane, owning, respectively, 50 percent, 25 percent and 25 percent of the stock issued and in circulation. There is no evidence in the record that the plaintiff has filed a certificate of dis *402 solution with, the Cuban Central Registry of Corporations and the Mercantile Eegistry of Havana. On these facts the plaintiff contends that it is “de facto dissolved,” although still in legal existence.
2. Transfer of Army surplus to Germany.
(a) Following the cessation of hostilities in Europe, the Army had large quantities of surplus vehicles there in varying degrees of condition. These were collected in 14 vehicle storage areas in Western Germany and France. Many were in need of repairs or the replacement of parts when placed in these areas. The vehicles were placed in open storage with little or no protective maintenance. During the years immediately following the war the Office of Foreign Liquidation Commission made attempts to dispose of these vehicles to European purchasers, and did dispose of some of the serviceable vehicles.
(b) In January 1948 the Army and the Office of Foreign Liquidation Commission made the so-called “bulk deal” agreement with the German authorities, whereby the balance of these vehicles, and other Army surplus, were sold for 21 percent of their acquisition cost to the Bizonal Economic Authority (legal predecessor of the Federal Republic of Germany). It was subsequently turned over to STEG, which is the abbreviated name of a German corporation, “Staatliche Erfassunge Gesellschaft.” STEG was a quasi-public German corporation, organized in 1946 by the Laender (States) of Bavaria, Wuertemberg and Hesse, and in which Bremen subsequently joined. STEG had been formed to dispose of captured enemy material and United States surplus property. STEG had legal title to the property.
3. STEG sales of surplus vehicles. Between 1948 and June 1950 STEG sold many of these vehicles, including those in the best condition. However, trucks having gasoline engines, as these did, were not in great demand in the postwar German market, where most trucks were diesel-powered, because of gasoline shortages. Most of the sales that occurred were to foreign purchasers.
4. Dawson “global” contract. Having considered the possibility of establishing foreign sales agencies to handle sales of the trucks and other surplus items not readily salable *403 in Germany, STEG, on February 28, 1950, entered into a so-called “global contract” with one George Dawson, whereby it sold to him all existing stocks of United States Army motor vehicles, trailers, semitrailers and spare parts, located at six designated depots, for a total consideration of $3,-200,000, payable over a period of time.
5. Assignment of “global” contract to Trucks <& Spares. In September 1950 a further agreement was entered into which had the effect of transferring Dawson’s rights and liabilities to Trucks & Spares, a German corporation organized about March 13, 1950. This took the form of an agreement to which STEG, Dawson, and Trucks & Spares were parties, whereby the STEG-Dawson contract was canceled retroactively, and STEG sold the same stocks to Trucks & Spares on the same terms it had given Dawson, except that payment was to be in Deutsch marks rather than in dollars.
6. Provisions of “global” contract. The contract between STEG and Dawson (succeeded by Trucks & Spares), after providing for the payment of the $3,200,000 purchase price in monthly installments through April 15, 1951, contained the following relevant provisions:
CO <509
‡ ‡ ‡ ‡ ‡
The purchaser can take in each case as many vehicles and parts as he has paid for in advance.
$ $ $ ‡ ‡
The purchaser decides in advance the number and type of items, which he intends to take over per month. He will receive from STEG immediately after having marked the vehicles, trailers, semitrailers and spare parts which come into question for his acceptance.
1. Invoices in triplicate
2. Export papers, as far as is necessary.
* * ❖ ‡ ❖
(b) The costs arising out of the maintenance of the depots, the guarding etc. of the motor-vehicle depots which are to be taken over in accordance with § 9 will be reckoned monthly by STEG and sent to the purchaser *404 in the form of an invoice. The bills for these costs are to be paid to STEG within 21 days. Annexed paper 5 gives particulars about how these costs are composed.
§ 4
All vehicles, trailers, semitrailers and spare parts remain in the property of STEG until payment is complete.
jfc A & *
§7
a ¡I&5* 8.&Í B ft ® S» p SO ¡-‘ÜJd 2 CD Cu d-O H H O g.® rt-Hb H • CO so S p Pr* (W P &.K-3 ^ CO oq 2 ¡3^ P 2 § 3 * H S <1 2 <j> cp ® rt H *lf® £2.3a £ ^ ■ ej-ir? so **B S* rtO.M
* * „
§ 11
Verbal agreements or additional changes in the contract are only valid if they are confirmed in writing by both parties.
§ 17
The purchaser authorizes
Truck & Spares G.m.b.H.,
Frankfort/Main,
the legally valid signatures of which are to be made known to STEG 30 days after contract of agreement, to assume the winding up of the contract in Germany and also to make payments to STEG in D-Marks.
7. Departures from “global” contract terms. The monthly installments under the global contract were not enforced. Despite contract provisions, in actual practice title or ownership of the trucks passed as the individual trucks or groups of trucks were selected and paid for, assuming the requirements of the German Civil Code as to delivery were complied with. Purchasers of trucks were allowed to remove them from the storage depots as they were paid for. Before a purchaser could remove his purchases from their place of storage he would have to obtain and present an order from *405 STEG- to the depot personnel to deliver. Such orders were issued after a determination was made that payment had been received and that the vehicles were available for sale (i.e., not already sold or reacquired).
8. The first “freeze."
(a) At the request of the European Command of the United States Army (EUCOM), the United States High Commissioner for Germany (HICOG), on or about September 15, 1950, requested the German Government to direct STEG to “freeze” (i.e., suspend the sale of) surplus property of United States origin in its possession. The German Government acceded to such request and, through its Ministry of Economics, issued such instructions to STEG. The purpose of this freeze was to permit technical military service teams to survey the property in the light of the needs of the United States Army in Europe. After the property had been so surveyed, the freeze was lifted, except for the property selected and designated by the survey teams as needed by the Army. During the period of the freeze, STEG refused to sell or deliver property of United States origin until it had been screened. After the Army had screened the property and indicated the items it desired, the Ministry of Economics directed STEG to deliver such items to the United States. Under this freeze, the Army reacquired at least 40 percent of the United States property still in the possession of STEG, although not all of this was of automotive type.
(b) In selecting vehicles under the first freeze, an inspection team was sent to the STEG depots, equipped with lists of the types of vehicles desired by the Army. These teams performed an inspection of all vehicles of those types in the depots. Generally, they found that the vehicles were in poor condition, due principally to the lack of any program of in-storage maintenance. Practically all vehicles inspected had some parts missing, either because the part had been absent when the vehicle had originally been placed in the depot, or because parts had subsequently been removed to make other vehicles operable. After a quality screening of the vehicles then on hand, the Army earmarked about 8,000 of the best for reacquisition, and these were thereafter delivered to the Army. It cannot be determined with any precision whether *406 the specific types of vehicles involved in the subject litigation were among the types which the Army sought to recapture during the first freeze.
9. Plaintiffs interest in surplus trueles for Carretera. In December of 1950 Autos Carretera Central, S.A., of Santiago, Cuba (hereafter Carretera), which had done business with plaintiff in the past, informally expressed an interest in buying some Dodge 1% ton 6x6 cargo trucks and some Chevrolet 1% ton 4x4 telephone construction trucks. Plaintiff’s purchases, at least in the United States and Europe, were principally handled at that time by Mr. Lewis Kane (hereinafter referred to as “Kane”). These needs were referred to Kane, who went to Germany about the middle of December 1950.
10. Selection of trueles.
(a) The record of events preceding and following the execution on January 20,1951 of the contract in suit between plaintiff and Trucks & Spares produces a sharp controversy as to whether the plaintiff at any time prior to the second freeze on March 17,1951 made a definite selection of specific surplus trucks and communicated that selection to either STEG or Trucks & Spares.
(b) In December 1950 Kane made inquiries at Trucks & Spares’ office in Germany as to the purchase of surplus trucks, and was told that the types he wanted were stored at STEG’s depot at Kitzingen. After general discussion of prices and an agreement that he could replace parts missing from any trucks he selected by “cannibalizing” other trucks (provided he paid for the labor involved), arrangements were made for Kane to inspect and select trucks at Kitzingen. He visited there on December 21 and, with the help of one Ringelman, an employee of STEG on leave and temporarily hired by Kane for the purpose, the vehicles at Kitzingen were inspected.[26] It is inconclusively established but reasonable to believe that a list was made of trucks considered to be in the best condition. An official of STEG (a Government witness) confirms that in December 1950 Kane proffered to him the list of trucks thus selected, but he (the *407 STEG official) refused to accept it and told Kane to submit it to Trucks & Spares. Kane testified that he then gave the list to an official of Trucks & Spares. That firm’s files contain no such list. Whether or not the list was actually delivered to Trucks & Spares is not conclusively shown in the record and in light of subsequent events raising a strong inference that the list was not delivered, it is concluded that plaintiff has failed to show that it actually delivered the list to Trucks & Spares in December 1950 or at any time prior to the freeze in March 1951. See findings 12-13, 16-17.
(c) The translation of the German contract of sale of January 20, 1951 (finding 12), and two letters in February involving STEG, the Kitzingen depot, and Trucks & Spares (finding 13), create the inference that at least through February 19,1951 neither STEG nor Kitzingen depot personnel knew specifically what trucks Kane had selected. On February 9, 1951, Trucks & Spares certified that there was no restriction in the nature of TJ.S. Army requirements or prior private sales to prevent the sale of the trucks to the plaintiff. This seems on the surface to conflict with the fact that on February 19,1957, the German sellers were not aware of the trucks plaintiff claims to have selected in December. However, what probably happened was that no Army-earmarked trucks from the first freeze remained at Kitzingen depot on February 9th and therefore Trucks & Spares could certify that there was no restriction in the nature of TJ.S. Army requirements without actually knowing what trucks plaintiff had selected. The same might well be true as to prior private sales.
(d) Ringelman, who had been hired by Kane to assist in the selection and inspection of the trucks, and possibly in the installation of missing parts, continued the inspection of vehicles at Kitzingen for the rest of the month of December, after Kane had left Germany.
(e) The circumstances support defendant’s contention that plaintiff has failed to prove that in fact Kane had given STEG or Trucks & Spares the list of specific trucks prior to the January 20, 1951 contract. Why Kane did not give the list to Trucks & Spares is not clear. But he may have hoped to make a better selection at Kitzingen or to obtain permis *408 sion to select vehicles at other depots and therefore did not wish to make a definite selection. This may be what actually happened as borne out by: (a) a letter of March 12, 1951, giving plaintiff permission to select elsewhere than at Kitzingen depot (see finding 15(d)), and (b) the contract and letters following the purported selection in December. See findings 12(b), 13.
11. Contract with Carretera.
(a) Kane returned to Cuba shortly before Christmas 1950 and informed plaintiff as to the status of the arrangements he had made to purchase trucks for Carretera. By letter dated January 2,1951, Carretera wrote plaintiff as follows:
With this letter we confirm, as per our verbal agreement with you, our order for the following listed equipment :
60 Dodge Military Trucks, 6 x 6, at $1,890.00 each.
25 Chevrolet Trucks, 4x4, telephone construction type, at $3,400.00 each.
We are to pay the Government Impost Taxes and Costs.
The financing of this deal is to be carried out in the manner we agreed to verbally. It is further agreed that this equipment shall be available to us in Cuba on or before June 1,1951, which final delivery date is a positive and irrevocable part of this order. It was further agreed when we gave you our verbal order that you would stand good for any little difficulties we might have as to the condition that this equipment might be in when delivered to us, and we rely on your word that they are in the condition you described to us.
We await receipt of your letter confirming acceptance of our order and agreement as stated above.
(b) On January 5,1951 the plaintiff replied to Carretera as follows:
This is to acknowledge receipt of your letter of the 2nd confirming our truck agreement.
Please be advised that our agent, Mr. L. T. Kane is on his way back to Germany and will be on the job there to do everything he can to expedite the shipment of the equipment from Germany as soon as possible.
As we told you, from our previous experience we should have these trucks in Cuba in some 60 to 90 days.
We will contact you from time to time as we get word how the shipping progresses as to when it will leave there and when it will arrive here.
*409 12. Contract with Trueles c& Spares.
(a)' On December 28, 1950, following Kane’s visit to Kitzingen, the managers of Kitzingen advised the STEG sales office that Kane desired to replace missing and defective parts on vehicles, and asked for instructions as to the procedures to be followed. The STEG sales office, under date of J anuary 3, 1951, quoted the text of this letter to Trucks & Spares, and requested its instructions. Trucks & Spares replied under date of January 9,1951, advising “that as yet no final agreement [probably meaning a written agreement] has been reached with Mr. Kane,” but that any trucks that “he will buy should be completed.”[27] This letter stated that information would be given at the appropriate time, and in the meantime requested STEG to delay the matter. Under date of January 11, 1951, the STEG sales office passed this information on to Kitzingen. Kane returned to Germany about January 9, 1951.
(b) Under date of January 20, 1951, a contract was entered into between plaintiff, referred to as the “buyer,” and Trucks & Spares, referred to as the “seller.” This contract read as follows:
1.The seller agrees to sell to the buyer:

Unit price

80 Trucks 2% t GMC, banjo type, 6x6, witb six tires military type, open cab, witb wincb, LWB, witb five spare rims_US$240
25 Obevrolets 1% t, witb four tires military type, witb wincb, closed cab, and three spare rims-US$200
82 Trucks 1% t Dodge, 6x6, complete witb six tires military type_US$200
2. The purchase price is ex location storage place Western Germany for the vehicles as they are and where they are, without any warranty on the sellers part.
3. The payment of the purchase price will be made as follows: The buyer will pay the purchase price to the seller in certified bank cheques as soon as the export permit and the export papers have been issued.
4. Shipment of the vehicles may be started as soon as the buyer has paid.
*410 5. The vehicles will be inspected and marked by the buyer.
6. Verbal arrangements or subsequent alterations of contract conditions shall only be valid if confirmed in writing by both parties.
7. Any litigations resulting from this contract shall be placed before the regular Court in Frankfurt/Main.
The description of Chevrolet trucks could apply to either cargo or telephone construction trucks. The point is controverted, but the record makes it abundantly clear that the reference in the contract to Chevrolet 1% ton trucks was intended to refer to Chevrolet 1% ton 4x4 telephone construction trucks, and not to Chevrolet iy2 ton cargo trucks.
13. Steps subsequent to the contract.
(a) On February 9, 1951, Trucks & Spares wrote to the STEGr sales office as follows:
With contract of January 20, 1951, we sold to the Cuban Truck & Equipment Company, Havana, Cuba, represented by Mr. KANE, the following vehicles from the Depot Kitzingen:
80 trucks, 2y2 tons, GMC, banjo (sic) ,6x6,
25 Chevrolet^, 1% tons, 4x4,
82 trucks, V/2 tons, 6x6, Dodge.
We ask you to give adequate instructions to the Depot Kitzingen so that the inspection and selection of the above-mentioned vehicles can be smoothly effected by Mr. KANE or his representives.
(b) On February 9, 1951, Trucks & Spares executed the following statement:

Statement:

Subj.: 80 Stock Trucks GMC 2y2 Ton, banjo, 6x6
25 Stock Chevrolets V/2 Ton,
82 Stock Trucks 1 y2 Ton, Dodge, 6x6
Auftraggeber: Cuban Truck & Equipment Company, Havana/Cuba
We hereby state that the goods mentioned in the attached application are neither blocked nor selected for withdrawal by the US Army and that furthermore there exists no sales-respectively delivery-restriction with regard to such a withdrawal.
*411 Tn case that a confirmation of this statement should be needed, please write to
EUCOM Hq., Heidelberg Logistics Div. Attn:
Lt. Col. J.E. Willis
Tel. Heidelberg Military 8130 or
EIJCOM Hq., Heidelberg Signal Div. Attn:
Major John J. Weigler
Tel. Heidelberg Military 8163
(c) On February 19, 1951, STEG wrote the following letter to its depot at Kitzingen:
The firm of Trucks & Spares informs us that with contract of January 20, 1951, the following vehicles were sold from the Depot Kitzingen to the firm of Cuban Truck & Equipment Company, represented by Mr. KANE:
80 trucks, 2y2 tons, GMC, banjo (sic), 6x6,
25 Chevrolets, V/2 tons, 4x4,
82 trucks, iy2 tons, 6 x 6, Dodge.
We request you to send us a list in duplicate after the inspection and selection of the vehicles so that we can transmit a copy to the firm of Trucks & Spares.
14. Export license.
(a) On March 7, 1951, the appropriate German office issued a Certificate of Approval authorizing Trucks & Spares to export 80 GMC 2y2 ton 6x6 trucks, 25 Chevrolet 1 y2 ton trucks, and 82 Dodge 1% ton 6x6 trucks. The certificate, which was valid until September 7, 1951, authorized shipment to plaintiff in Cuba. It had been endorsed for “export clearance” by the Military Security Board on March 5,1951. It reports under the legal requirement that payment was made in foreign currency.
(b) This Certificate of Approval had attached to it the February 9, 1951 statement of Trucks & Spares quoted in paragraph (b) of finding 13.
15. Plaintiff’s payments under the contract.
(a) The contract of January 20, 1951 (finding 12(b)) provided that plaintiff would pay the purchase price on issuance of the export permit and papers. These were issued on March 7,1951 (finding 14(a)).
*412 (b) On March. 12, 1951, plaintiff gave Trucks & Spares two checks, one for $1,640 payable to Trucks & Spares, and one for $14,760 payable to STEG. Trucks & Spares gave plaintiff a receipt for these checks as full payment for 82 Dodge 1% ton 6x6 trucks in accordance with the January 20, 1951 contract. Also, on March 12, 1951, plaintiff gave Trucks & Spares a check for $100 and was given in exchange a receipt showing the $100 as a downpayment on 25 Chevrolet V/2 ton trucks and 80 GMC 214 ton 6x6 banjo trucks, “according to our contract with you, dated 20 January 1951.” Also, on March 12, 1951, Trucks & Spares gave Kane written acknowledgment of having received $3,000 (in cash or check is not stated) as deposit on 25 Chevrolet 4x4 telephone construction trucks “out of our camp Kitz-ingen, according to our contract dated 20th January 1951.”
(c) All of the payments except the one for $3,000 were recorded in the check register maintained by Trucks & Spares as credits to plaintiff’s account, but the $3,000 payment is not so recorded and defendant contends that no such payment was made. Although it is not clear why the $3,000 was not paid in the same manner as the other moneys (plaintiff says it was paid in cash and not by check), or why the payment is not evidenced by a corresponding credit entry in the records of Trucks & Spares, the presumption of payment of the $3,000 established by the written acknowledgment of its receipt is not overcome by the absence of secondary evidence reflecting its payment. It is possible that a bookkeeping mistake occurred. The $3,000 was sufficient to pay for 15 Chevrolet trucks in full, but was not allocated to any particular 15 of the 25 trucks which plaintiff contracted to buy.
(d) On March 12, 1951, Trucks & Spares gave the following letter to Kane:
Referring to your conversation you had today with our Mr. Hess we confirm to you that we are willing to change our contract insofar as we will give you permission to pick out your trucks from any of our stock, located in any STEG camp.
You may take possession of all or part of your trucks as you pay for it.
*413 (e) Plaintiff has never been reimbursed for any of the sums it paid Trucks & Spares as related in the preceding paragraphs of this finding.
16. The second “freeze.”
(a) On March 6,1951, the Secretary of the Army, through the Chief of Staff of the Army, inquired of the Commander-in-Chief of the European Command if any economically reparable equipment of United States origin remained in the hands of STEG, and if there were any, to request HICOG to freeze the property for screening against world-wide requirements of the Army. The basis for this request was that the “property to be reacquired would be that in short supply world-wide and needed for the war effort.” The war effort referred to was that in Korea.
(b) On March 17,1951, HICOG officials met with officials of the German Government and requested them to have STEG put a freeze into effect. On the same day, the Federal Ministry of Economics agreed to this request and directed STEG as of noon to “exclude immediately all U.S. goods” in its depots from sale. The parties agree that the freeze was voluntary and not mandatory upon the German Government and that no compulsion was exercised by the defendant in securing the cooperation of the German Government. STEG was acting solely on order from the German Government, and neither it nor the German Government were agents of the United States. On representations from HICOG that STEG would be compensated against third-party claims, the freeze included property which might be deliverable to third parties.
(c) An Army survey team was sent from Washington to screen the equipment and parts at the STEG depots, since STEG inventory controls did not reflect the physical condition of the property. After surveying and screening the equipment at Camp Kitzingen on March 28 and 29 and on April 4 and 5,1951, the survey team selected and marked certain trucks and other automotive equipment for reacquisition by the Army. The survey team had a list of the types of vehicles, for example, for which the Army had a demand. *414 It merely selected vehicles of that type, regardless of condition, with the expectation that all of the vehicles would be taken to local rebuilding plants and completely disassembled, and that from the components so derived, plus possibly other parts, it would be possible to reassemble a smaller number of vehicles of that type. Among the vehicles selected for reacquisition were 81 of the 82 Dodge trucks and all 25 of the Chevrolet trucks which are involved in the present suit.
(d) On April 18, 1951, HICOG sent the lists of items selected by the survey teams to the German Ministry of Economics. On the following day the Ministry of Economics instructed STEG to remove the freeze except as to the listed items, and to hold those for delivery to the United States on request.
(e) It was the position of the Ministry of Economics and of STEG that during the freeze STEG could for political reasons take no action with respect to goods of United States origin held by it, and that after the freeze, it could do nothing with the goods selected by the United States except to redeliver them to it. HICOG actually had no legal right to order the freeze, and thus dealt through the German authorities.
17. Post-freeze identification of trucks.
(a) Late in March 1951 Kane learned of the freeze. He wired protests on April 1 to HICOG, STEG, EUCOM and the German Ministry of Economics, and announced an intention to remove the trucks he had contracted for. The German Ministry of Economics replied on April 8 that the freeze was imposed at the “direction of the Allied High Commander” and expressed regrets.
(b) On April 2, 1951, Trucks & Spares wrote to STEG advising that plaintiff had purchased the trucks in suit as referred to in the previous letter of February 9, 1951 (see finding 13(a)), and had paid for the 82 Dodges but had not been paid in full up to that time for the Chevrolets.
(c) On April 3 Kane met Kingelman at the Kitzingen depot, paid him for his past services, received from him the handwritten list of Dodge trucks prepared the preceding *415 December (Kane did not have a copy of the list), and gave the list to the personnel at the Kitzingen depot to copy. The latter, who did not have a list of the trucks which had been selected there the preceding December, made a copy of Kingelman’s list and sent it to the STEG sales office for processing. They told Kane that he could not remove the trucks because of the freeze.
(d) On April 19,1951, STEG wrote to plaintiff advising it of the freeze imposed “on account of a request from the American Government”, and stating in part as follows:
* * * Under this block fall also the following goods purchased by you from Trucks & Spares Kraftfahrzeuge G.m.b.H., Frankfurt/Main:
82 Dodges
25 Chevrolets
from our store at Kitzingen, and
80 GMGs
from our store at Bad Cannstatt
Of above list, the 82 Dodges 1% ton were chosen by representatives of your firm at Kitzingen in December last year and these were paid to us by Trucks and Spares with a US Dollar cheque for $14,760 on March 15. Payment of the balance of vehicles, which should also have been done through Trucks & Spares, has not been effected up to date.
We are eager to get the decision of the U.S. Army as quickly as possible as to whether the goods purchased by you will be put again at your disposal or if these are finally claimed by the U.S. Army. If the latter is the case, it is expected that the U.S. Army will notify you direct of the requisition, as far as these goods have already become your property. We beg you to be convinced that we will take care of your interest with emphasis as far as this is possible to us.
Although this letter refers to a selection made in December, there is an insufficient showing that any list was transmitted to the sellers until after the freeze. See findings 10 and 17(c). This letter probably refers to a December selection simply because plaintiff, through Kane, claimed to have made the selection in December.
(e) On May 7, 1951, STEG formally notified Kane in writing that the United States Army had selected for con *416 fiscation the 25 Chevrolet trucks which plaintiff had selected for purchase. At some undisclosed date plaintiff had furnished to the sellers a handwritten list of these 25 trucks, receipt of which list was endorsed thereon by a STEG representative on May 7, 1951. This indicates that plaintiff may have failed until May 7,1951 to designate to the sellers the specific Chevrolet trucks which it wished to buy.
18. Accrual of cause of action.
(a) On May 4, 1951, plaintiff wrote to HICOG requesting advice as to whether the United States Army was reacquiring the Dodge trucks in suit. On May 4, 1951, HICOG advised plaintiff in writing that the Dodge trucks were to be reacquired.
(b) On May 9, 1951, plaintiff wrote a letter to HICOG as to the 25 Chevrolet trucks in suit, and on May 13 EUCOM advised plaintiff in writing that the 25 Chevrolet trucks and 81 of the 82 Dodge trucks in suit were to be reacquired by the Army.
(c) By telegram of May 24, 1951, plaintiff submitted to EUCOM invoices for the 81 Dodges and 25 Chevrolets in suit totaling $238,090. By letter dated June 11,1951, plaintiff augmented its invoices with certain documents evidencing plaintiff’s ownership of the trucks, and requested payment for them.
(d) The trucks in suit remained at Kitzingen depot until August 1951. From August 2, 1951 until January 1952 the Army removed them and many other reacquired trucks from the depot to centers for rebuilding. From late April 1951 to January 1952 the Army posted a representative at the Kitzingen depot as a property accountable officer in charge of shipping the trucks out to rebuilding centers.
(e) On August 2,1951, and on each occasion thereafter as the trucks were removed from the STEG depot at Kitzingen a representative of the defendant executed a property receipt in which he certified that “I have taken possession of the property listed on this receipt from the above designated agency.”
(f) Plaintiff’s counsel carried on protracted negotiations with defendant’s officials until January 14, 1956, when he submitted a formal settlement proposal covering the 81 *417 Dodge tracks. The plaintiff’s claim for the 25 Chevrolet tracks was still under investigation at this time. Contemporaneously plaintiff was pursuing its claim against the sellers by way of efforts to negotiate a settlement. The settlement negotiations with defendant and the German authorities were still in process when plaintiff filed its petition in the case in suit on May 27,1957.
19. Chevrolet cargo truck sale. On May 22, 1951, Kane contracted orally with Trucks & Spares for plaintiff to purchase 25 Chevrolet 1% ton cargo trucks. Although these cargo trucks and the 25 Chevrolet telephone construction trucks had certain basic features in common, they were not alike in important construction detail or in function and purpose, and the cargo trucks would not fulfill plaintiff’s contract commitment to Carretera. Plaintiff paid $5,000 for the cargo trucks on or about May 27, 1951, and obtained delivery of them since they were not of a type which had been selected by the Army for reacquisition. The defendant contends that the 25 cargo trucks were sold to the plaintiff as a substitute for the 25 Chevrolet telephone construction trucks which Trucks & Spares had been prevented from delivering, and therefore were a fulfillment of that part of the contract in suit. The description of the Chevrolet trucks in the basic contract was not specific and would have applied to either the cargo trucks or the telephone construction trucks. The cargo trucks were actually exported under the export license previously granted plaintiff for all of the trucks covered by the basic contract. The invoice given plaintiff by Trucks & Spares to cover the May 22 purchase of the 25 cargo trucks bore a number referring to the number by which the books and records of Trucks & Spares carried the original contract. Plaintiff’s payment of $5,000 for the cargo trucks was credited in the check register and ledger of Trucks & Spares as a credit against the original contract obligation. However, the $3,100 which plaintiff had previously paid on March 12 on account of the 25 Chevrolet telephone construction trucks under the original contract was not credited against the $5,000 purchase price of the cargo trucks. The official of Trucks & Spares who negotiated the sale of the Chevrolet *418 telephone construction trucks testified that they were separate and unrelated transactions. The cargo trucks would not have fulfilled plaintiff’s contract commitment to Car-retera, and plaintiff bought them in order to fill the ship which it had hired to transport its purchases to Cuba. The cargo trucks were eventually resold by plaintiff to Cuban purchasers other than Carretera. It is concluded that the sale and delivery of 25 Chevrolet cargo trucks to plaintiff was not in satisfaction of the obligation of Trucks & Spares under the original contract to deliver 25 Chevrolet telephone construction trucks, nor in substitution for it.
20. Cancellation of Carretera contract. Under date of May 14, 1951, Autos Carretera wrote to plaintiff’s office in Cuba, reminding plaintiff that time was of the essence in the receipt of the 60 Dodges and 25 Chevrolets it had ordered in the preceding January. Plaintiff did not reply to this letter, but deactivated plaintiff and transferred its assets to a successor company, as described in finding 1(a), in an attempt to avoid reprisals by Autos Carretera. Under date of June 5, 1951, Autos Carretera canceled its contract for nondelivery. Neither plaintiff nor its successor was ever required to pay anything to Autos Carretera for this breach of contract.
21. Title to trucks u/nder Gertnan law. The factual question of whether or not under German law (which the parties concede to be applicable) the plaintiff acquired title to the trucks in suit was sharply controverted. It is found as a matter of fact that under applicable German law (set forth infra) title to the 81 Dodge trucks and 25 Chevrolet trucks in suit did not vest in the plaintiff prior to March 17,1951, the date of the “freeze” order. The possibly relevant sections of the German Civil Code are as follows:
s. 164 A legal declaration made by somebody within his competent power of attorney in the name of the principal has immediate effect for and against the principal. It makes no difference whether the declaration is made in the name of the principal or the circumstances show that it should be in such name.
If the intention, to act in the name of somebody else is not recognizable the lack of the intention to act in his own name does not matter.
*419 s. 167 Tlie power of attorney is granted by declaration either to the agent or to the third party with whom the agent is supposed to act.
The declaration need not have the legal form of the act to which the power of attorney refers,
s. 183 The prior consent (acceptance) is revocable as to the legal undertaking except where legal relation prevents the revocation.
The revocation may be declared to either party,
s. 184 The subsequent consent (ratification) is retroactive to the moment of the execution of the act, except it is otherwise declared,
s. 185 A disposition by somebody not entitled to make it is valid if made with the approval of the party entitled to make it. It becomes valid if the party entitled ratifies it or if the person disposing acquires the object or if he becomes successor to the entitled party and is liable for all debts of the estate without restriction. In the last two cases if there are more controversial dispositions the earlier one is valid.
s. 249 Whoever is liable to pay damages has to restore the state which would exist if the facts which created the obligation to pay damages would not have happened. If the damage results from an injury to a person or damage to a thing, the claimant may ask for compensation in money instead of restoration.....
s. 251 Insofar as restoration in kind is either impossible or insufficient for the claimant, damages are to be paid in money.
The defendant may pay in money, if the restoration in kind is possible only with disproportionate expenditure.
s. 252 Damage payable includes the lost profit. Profit is considered as lost, which in the normal course of things or under the special circumstances considering the provisions and preparations made was to be expected with reasonable probability.
s. 433 By the contract of sale the vendor has to deliver the sold thing and to transfer the ownership thereof. The vendor of a right has to procure the right to the purchaser and, if the right entitled to the possession of a thing, to deliver the thing.
The buyer has to pay the agreed price and to take delivery of the thing bought.
*420 s. 455 If the vendor of a moveable thing has reserved the ownership until the payment of the price, it is to be assumed that the transfer of ownership is made under the delaying condition of full payment of the sales price and that the vendor may cancel the contract, if the buyer defaults as to payment.
s. 854 The possession of a thing is acquired by attaining physical control over the thing.
The agreement between the former possessor and the acquirer is sufficient, if the acquirer is in the position to exercise control over the thing.
s. 868 If somebody holds possession as usufructuary, pledgee, lessee, tenant, bailee or in any similar relationship, under which he is entitled or obliged against somebody else to hold possession, the other party also has possession (indirect possession) .
s. 870 Indirect possession may be transferred by assigning the claim to deliver the thing.
s. 929 For the transfer of ownership of a moveable it is necessary that the owner deliver the thing to the acquirer and agree with him that the ownership shall pass. If the acquirer is in possession of the thing the agreement as to the passing of ownership is sufficient.
s. 930 Where the owner is in possession of the thing, an agreement between him and the acquirer relating to a legal relation whereby the acquirer acquires indirect possession takes the place of delivery.
s. 931 Where a third party is in possession of the thing, assignment by the owner to the acquirer of the claim for the delivery of the thing takes the place of delivery.
s. 933 Where a tiling alienated under 930 does not belong to the alienor, the acquirer becomes owner if the thing be delivered to bim by the alienor, unless he is in bad faith at the time of delivery.
s. 934 Where a thing alienated under 931 does not belong to the alienor, the acquirer becomes owner, if the alienor is indirect possessor of the thing, at the time of the assignment of the claim to possession, or at the time at which the acquirer acquires possession from a third party in all other cases, unless the acquirer is in bad faith at the tune of the assignment or of the acquisition of possession.
*421 s. 935 Ownership may not be acquired under 932 to 934 if the thing has been stolen from the owner, or has been lost, or has otherwise become missing. Where the owner was only indirect possessor, the same rule applies if the thing has been missed by the possessor.
These provisions do not apply to money or instruments to bearer, nor to things which are alienated by means of public auction,
s. 989 The possessor, from the beginning of the lawsuit, is liable to the owner for all damages which arise out of the fact that, due to his fault, the thing deteriorates or is lost or cannot be delivered for any other reason,
s. 990 If the possessor was not in good faith at the time of taking possession, his responsibility against the owner is ruled by s. 987, 989. If the possessor learns later on that he is not entitled to the possession, he is likewise responsible from the time of his knowledge. Any further liability of the possessor for being in default remains undisturbed.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover. The petition is dismissed.

 At the request of the court, Trial Commissioner C. Murray Bernhardt prepared an opinion which has been of very material assistance.

 Apart from the fact that the corporation is inactive, the stockholders (all American citizens) claim to have effected a “de facto” dissolution on the eve of the concluding trial session. That measure was apparently undertaken for the purpose of avoiding the issue of “reciprocity” under 28 U.S.C. § 2502, by attempting to substitute American citizens for the Cuban corporation. Section 2502 provides:
“Citizens or subjects of any foreign government which accords to citizens of the united States the right to prosecute claims against their government *384 in its courts may sue tie united States in the Court of Claims if the subject matter of the suit is otherwise within such court’s jurisdiction.”
Because of our disposition of the cause on other grounds, we do not touch the question of the standing of this Cuban corporation, in the light of current happenings, to sue in this court.

 Plaintiff also invokes “implied contract.” “But whether the theory of * * * [the suit], be that there was a taking under the Fifth Amendment, * * * or that there was an implied promise by the Government to pay for it, is immaterial. In either event, the claim traces back to the prohibition of the Fifth Amendment, ‘nor shall private property be taken for public use, without just compensation.’” United States v. Dickinson, 331 U.S. 745, 748 (1947).

 War Department Field Manual 27-10 (1940), as amended, Nov. 15, 1944. The text of the regulation is set forth, infra, in Part I of this opinion.

 The terms of the global contract are set forth in finding 6.

 The German Federal Republic had been set up by that time.

 Whether this list was given to Trucks & Spares is sharply controverted and is decisive of the question of passage of title (ownership being important in a “taking” case). The facts on this point are more fully discussed, infra, in Part II of this opinion.

 Whether this was the first time or the second time plaintiff submitted a list of the trucks to the German sellers is, as pointed out in footnote 7, supra, critical for this case.

 In pertinent part, 28 U.S.C. § 2501 reads:
“Every claim of which the Court of Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.
*****
“A petition on the claim of a person under legal disability or beyond the seas at the time the claim accrues may be filed within three years after the disability ceases.”

 An Army officer took physical control of the entire cargo of a ship, a part of which belonged to plaintiffs, and he denied plaintiffs’ agents access. The intention of the officer was to conserve the cargo so that parts of it would be available for military use. There was held to be no taking except for the goods actually selected.

 “A taking of property within the meaning of the Constitution may be accomplished without formally divesting the owner of title to the property or of any interest therein. It is not material whether the property is removed from the possession of the owner, or in any respect changes hands * *

 Whether there is authority for the appropriation is another question. See, e.g., United States v. North American Trans. & Trading Co., 253 U.S. 330 (1920). Likewise a separate issue is whether the claimed “appropriation” constituted a compensable taking, or a taking at all.

 This phrase meant the Army surplus goods which the united States had sold to Germany, i.e., goods of united States origin. Germany, through STEG, had title to the materiel.

 Or under Article 331 of the Rules of Land Warfare (see infra). The same principles as to time of seizure would apply.

 After the seizure, plaintiff negotiated with united States and German officials to recover compensation. It says that during the period of attempted administrative settlement the statute of limitations did not run. A lilse argument was squarely rejected by the Supreme Court in Soriano v. United States, 352 U.S. 270, 274-75 (1957).
Plaintiff claims, in addition, that it was. “misled” by the united States officials with whom it dealt into believing that a settlement would be achieved and, therefore, that the Government ought not be permitted to succeed on the limitations question when it was the Government- which caused plaintiff to delay its suit. Plaintiff admits, however, that there is nothing in the record to show that the officials were - deceitful. There is likewise nothing indicating that the officials asked that suit not be brought. Plaintiff was at all times represented by counsel. The mere continuance of negotiations, even where united States representatives express a view that a settlement is likely, constitutes no reason to extend the limitations period. This is especially so where a claimant has been adequately represented by counsel during the negotiations. When settlement talks stretched out for a long time there was nothing to prevent plaintiff’s counsel from filing a protective claim in this court. Cf. Oakland Truck Sales, Inc. v. United States, 138 Ct. Cl. 63 (1957).

 After December 81, 1946, tbe United States did not ordinarily vest German interests In property, nnder tbe Trading With the Enemy Act, except property which was vestable prior to that date. See Gmo. Niehaus 6 Co. v. United States, 145 Ct. Cl. 173, 170 F. Supp. 419 (1959); Farbenfabriken Bayer A.G. v. Sterling Drug, Inc., 251 F. 2d 300, 302, 304 (C.A. 3), cert. denied, 356 U.S. 957 (1958).

 Under 28 US.C. § 2501, a petition in this court “on the claim of a person under legal disability or beyond the seas at the time the claim accrues may be filed within three years after the disability ceases.” See footnote 9, supra. Plaintiff agrees that all disability, if it had any, ceased when peace was formally declared in October 1951. It did not bring suit within three years thereafter.

 If title had not passed to plaintiff, its claim would merely be for frustration of its contract with Trucks & Spares, not for a taking or seizure of its property. Such a claim is not cognizable in this court. Omnia Commercial Co., Inc. v. United States, 261 U.S. 502 (1923). Plaintiff does not contend otherwise.

 The “global” contract between STEG and Trucks & Spares did have a clause concerning passage of title. See finding 6. That provision, however, has no effect on the problem with which we are dealing. See finding 7.

 After the freeze was Instituted in March 1951, i.e., when the German Government ordered STEG not to deliver goods of united States origin, “indirect” possession could not have been acquired by plaintiff under section 930 of the Civil Code.

 Ringelman was an employee of STEG who was then on leave. He never returned to work for STEG; he was discharged.

 Commissioner Bernhardt did not hear the pertinent testimony and his findings do not indicate that, in finding for plaintiff, he relied heavily on the credibility, of Kane’s oral testimony, of itself.

 The only list they had was the one given to them in April 1951, after the March freeze.

 On February 9th, Trucks & Spares also certified that there was no restriction in the nature of U.S. Army requirements or prior private sales to prevent the sale of 82 Dodge and 25 Chevrolet trucks to plaintiff. This certification was made in order to obtain export clearance from the German Government for the trucks. The trucks were not listed by serial number; summary descriptions of “25 Stock Chevrolets” and “82 Stock Trucks 1% Ton, Dodge,” were used. Finding 13(b) gives the text of the certification. This does not show whether the particular trucks plaintiff claims to have selected were known to Trucks & Spares. But even though Trucks & Spares did not know what trucks plaintiff had selected, we think it could still know that there was no existing restriction on them. It is possible that no Army-earmarked trucks (presumably marked during an earlier freeze) remained at Kitzingen on February 9th; therefore, Trucks & Spares could (without actual knowledge of plaintiff’s choice) honestly certify that there was no restriction. The same may be said for prior sales. Another explanation could be that its Kitzingen stock was so large that Trucks & Spares could meet the requirements of plaintiff’s contract, as well as other requirements which might have existed at the time. One witness testified that in 1951 over 2,000 vehicles were at Kitzingen depot. Tr. 378.

 We have considered the other evidence to which plaintiff points in support of its position. The testimony of Hess (the official of Trucks & Spares to whom Kane says he gave the list in December) as to his receipt of a list is both unelaborated and equivocal; in addition, he did not recognize the handwritten list obtained from Kingelman (the one list we are sure existed). Oebel, another Trucks & Spares man, saw “Kane” markings on trucks, but his testimony did not tie these markings to the particular vehicles involved here; Kane appears to have dealt widely in trucks in Germany. Knoess, a freight handler, said he received from Kane the types and numbers of trucks to be moved, but again this part of the testimony is very general and not adequately connected to the trucks in suit. The same is true of Kane’s own testimony as to “marking” ; it is not always clear whether he meant “marked on the truck” or “marked down on a list,” and much of his testimony on the point is general and unrelated to particular transactions.
On the other hand, the defendant finds support in Ringelman whose testimony leaves the strong inference that he kept the list made in December and did not give Kane either that list or a list of the trucks thereafter selected until April 1951.

 Ringelman never returned to work for STEG. He testified that he was fired by STEG as of December 31, 1950.

 Plaintiff says that the phrase “will buy” suffers a loss in meaning in the translation from German, and that a closer translation would be “desires to buy.”